[No. S142947. June 4, 2007.]

ZENGEN, INC., Plaintiff and Appellant, v.
COMERICA BANK, Defendant and Respondent.

240

---

**COUNSEL**

Burton V. McCullough for Plaintiff and Appellant.

Buchalter, Nemer, Fields &, Younger, Buchalter Nemer, Michael L. Wachtell, Jeffrey S. Wruble, Robert S. Addison, Jr.; Greines, Martin, Stein & Richland and Marc J. Poster for Defendant and Respondent.

Leland Chan for California Bankers Association as Amicus Curiae on behalf of Defendant and Respondent.

Sullivan & Cromwell, Bruce E. Clark, Christopher R. Edgar, H. Rodin Cohen and Michael M. Wiseman for The Clearing House Association L.L.C., as Amicus Curiae on behalf of Defendant and Respondent.

---

**OPINION**

**CHIN, J.**—It appears the chief financial officer of a company embezzled $4.6 million by directing four fraudulent funds transfers from the company's account to an account he controlled. He has disappeared with the money. The ultimate question in this litigation is who must bear the loss: the bank that honored the fraudulent payment orders or the company that employed the embezzler. We granted review to decide two questions arising under California's Uniform Commercial Code (hereafter, sometimes, California Code).[1]

---

[1] All statutory citations are to the California Uniform Commercial Code unless otherwise indicated. Division 11 of that code (division 11), the part relevant to this case, is identical to article 4A of the Uniform Commercial Code (article 4A). (See pt. II, *post.*)

First, we must decide whether a cause of action under the California Uniform Commercial Code displaces other common law causes of action such that the company must recover from the bank under the California Code or not at all. Because the California Code provides detailed rules and procedures concerning funds transfers that squarely cover the transactions at issue, we conclude that the California Code does displace common law causes of action.

Second, as a prerequisite to recovering from the bank, the customer must "notif[y] the bank of the customer's objection to the payment within one year after" the customer received payment notification. (§ 11505.) We must decide exactly what objection the customer must convey to the bank. Reading the statute in context, we conclude that the customer must not merely inform the bank that the payment orders were unauthorized or fraudulent; it must inform the bank in some way that the customer objected to what the bank had done in accepting the payment orders. But the statute does not require any particular formulaic words. Rather, it is sufficient if, based on all of the circumstances, a reasonable bank would understand that the customer was objecting to what the bank had done in accepting the payment orders or otherwise considered the bank liable for the loss. We will remand the matter to the Court of Appeal to apply this test to the facts of the case.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff Zengen, Inc. (Zengen), is a biopharmaceutical company formed in May 1999 with Johnson Liu as its chief executive officer and Fung Yen as its chief financial officer. Shortly after incorporating, it opened several bank accounts, including money market account No. 88-012-298 (the 298 Account), at Imperial Bank, which defendant Comerica Bank has since acquired.[2] In connection with the opening of these accounts, Liu and Yen executed a business signature card and a funds transfer authorization agreement. The authorization agreement did not specifically list the 298 Account by number, but Liu has acknowledged that the authorization applies to it. Liu and Yen were the company's authorized signatories.

While Liu had unlimited check signing authority, Yen's authority was limited to checks not exceeding $10,000. The funds transfer authorization agreement stated that "any transfer over $50,000, requires both CEO & CFO authorization." (Original underlining.) It listed Liu as Zengen's "CEO" and

---

[2] We will refer to Imperial Bank and Comerica Bank collectively as the Bank.

Yen as its "CFO." Next to the listings of both Liu and Yen as authorized persons was the annotation "V & F." The agreement stated that "F = FAX" and "V = VERBAL."[3]

It appears that from mid-2000 to early 2001, Yen embezzled $4.6 million from Zengen by directing four funds transfers from the 298 Account to an account he controlled. To do so, he formed a British Virgin Islands corporation, which he named Zengen, Inc. He then opened an account at Chinatrust Bank in the name of this new corporation with an initial deposit of $1,000, with himself as the sole authorized signatory. Between July 11, 2000, and February 5, 2001, the Bank processed four payment orders, which are the subject matter of this lawsuit. It appeared on their face that Liu had signed and authorized the payment orders. As was customary, they were faxed to the Bank for processing and payment. The orders requested the Bank to draw funds out of the 298 Account and to wire them to Zengen, Inc.'s account at Chinatrust Bank in the amounts and on the dates as follows: $185,000 on July 11, 2000; $550,000 on September 11, 2000; $1.5 million on November 22, 2000; and $1.7 million on February 5, 2001. The Bank processed the payment orders and debited the 298 Account for these transactions. The transactions appeared on Zengen's monthly bank statements, which Zengen acknowledges it received.

Zengen's account statements and transaction notices were addressed to Yen as the company's chief financial officer. Probably for this reason, the company did not immediately discover Yen's actions. Zengen first learned that something was wrong on June 13, 2001. After that date, Zengen's office manager, Regina Samuel-Ramcharitar, worked with Tony Galvez of the Bank to uncover the unauthorized activity concerning the 298 Account.

Samuel-Ramcharitar's declaration states the following. Sometime before June 27, 2001, she told Galvez that "Zengen had not been aware of the transfer of the funds, that Mr. Liu had not signed the wire transfer request, that Mr. Yen himself had no authority to transfer the funds, that the wire transfer request was fraudulent and had not been authorized by Zengen, and that Zengen believed that Mr. Yen had stolen the money." On July 10 or 11, after further investigation, she additionally told Galvez that Zengen "had received microfilm documents from Chinatrust Bank showing additional wire transfers from Imperial Bank to Chinatrust Bank, gave him the dates and amounts set forth above, and told him that these transfers, like the transfer of

---

[3] In its brief in this court, Zengen stated that this agreement meant that "[b]oth Liu and Yen had to sign and verbally confirm any request for wire transfers over $50,000.00." The Bank did not dispute this interpretation of the funds transfer authorization agreement in its brief, but at oral argument it stated it had a different interpretation. If they think it appropriate, the parties may pursue this point on remand.

the $1,700,000.00 on February 5, 2001, were fraudulent and unauthorized, that it appeared that Mr. Yen had stolen this money as well, and asked him to obtain for us the bank's documentation on those transfers. In this and in all my conversations with Mr. Galvez, I continued to keep Mr. Galvez apprised of the facts as we learned them concerning Mr. Yen's fraudulent transfers of funds from the Zengen account at Imperial Bank to the supposed Zengen account at Chinatrust Bank. By July 12, 2001, I had specifically told Mr. Galvez that Zengen did not authorize the four wire transfers [at issue] and that it appeared that Yen had fraudulently transferred the money."

Liu testified in a deposition that sometime in June, 2001, he told Julie Yen,[4] a Bank official, "I didn't authorize any of those transactions. I suspect that he [Yen] must have cut and paste[d] my signature if you saw both signatures in there." He also testified that he also spoke with Julie Yen at a restaurant in Monterey Park. He could not remember when this conversation occurred. When he was asked at the deposition, "Do you recall what, if anything, Ms. Yen said to you?" Liu responded, "No. It's just very general discussion, you know, about bank being sued. And she was just trying to find out—I think she was just trying to find out what has been going on."

By August 2001, when Zengen filed a report with the Los Angeles District Attorney's office, which included details of the four unauthorized payment orders, Zengen had concluded that Yen had stolen money from the company by ordering the wire transfers from the 298 Account to the Chinatrust Bank. By that time Yen had disappeared with the company's financial records and could not be located.

On February 20, 2003, Zengen filed the instant lawsuit against the Bank and other parties. It claims the Bank is liable for the $4.6 million loss because it should not have accepted the four unauthorized payment orders. The complaint alleged causes of action against the Bank for breach of contract, negligence, a refund of payment under section 11204, return of deposit, and money had and received. The Bank demurred. The trial court sustained the demurrer without leave to amend to the negligence cause of action on the ground that the California Uniform Commercial Code had displaced a negligence claim. Ultimately, after the complaint was amended, the trial court denied the demurrer to the other causes of action. However, the court later granted summary judgment in the Bank's favor on all of the remaining causes of action. It made two critical rulings: (1) The California Code had displaced the non-California Uniform Commercial Code causes of action; and

---

[4] Fung Yen and Julie Yen are no relation. To avoid confusion, we will refer to Julie Yen by both her first and last names.

(2) Zengen could not prevail on its California Code claim because it failed to notify the Bank of its objection to the payments within the time that section 11505 prescribes.

Zengen appealed. The Court of Appeal affirmed. The majority, in an opinion authored by Acting Presiding Justice Armstrong, agreed with both of the trial court's rulings. Justice Mosk dissented. He agreed that the California Code displaced Zengen's common law causes of action. However, he believed that Zengen adequately notified the Bank of its objection within the meaning of section 11505, and, therefore, the trial court should not have granted summary judgment on the California Code cause of action.

We granted Zengen's petition for review.

## II. Discussion

"The 1990 Legislature enacted Article 4A of the Uniform Commercial Code as Division 11 of the California Uniform Commercial Code (U.C.C. 11101 et seq.), entitled 'Funds Transfers.' " (4 Witkin, Summary of Cal. Law (10th ed. 2005) Negotiable Instruments, § 132, p. 505.) In one of its causes of action, Zengen seeks from the Bank a refund of the fraudulently transferred funds under these provisions. Zengen also seeks recovery from the Bank under various other causes of action. The issues before us on review are whether (1) the California Uniform Commercial Code displaces the remaining causes of action, and (2) Zengen is precluded from recovering under the California Uniform Commercial Code because it failed to notify the Bank in time of its objection to the payments.[5]

To place these issues into context, we will first review the relevant portions of division 11 of the California Uniform Commercial Code and their general application to this case. Then we will discuss the two issues in order.

---

[5] The parties sometimes use the word "preempt" rather than "displace" in discussing what effect the California Code has on the other causes of action. Technically, the doctrine of preemption concerns whether a federal law has superseded a state law or a state law has superseded a local law, not whether one provision of state law has displaced other provisions of state law. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 568 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; see also § 1103 [using the word "displaced"].) Here, the California Code and other causes of action are all matters of state law. Accordingly, we will use the word "displace" in discussing this issue.

## A. *Division 11 of the California Uniform Commercial Code*

■ With one exception not relevant here, division 11 of the California Code applies to "funds transfers defined in Section 11104." (§ 11102.)[6] As relevant here, section 11104, subdivision (a), defines a "funds transfer" as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."[7]

Section 11103 defines other terms important to understanding these issues:

"(a) In this division:

"(1) 'Payment order' means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if all of the following apply:

"(i) The instruction does not state a condition to payment to the beneficiary other than time of payment.

"(ii) The receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender.

"(iii) The instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank.

"(2) 'Beneficiary' means the person to be paid by the beneficiary's bank.

"(3) 'Beneficiary's bank' means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account.

"(4) 'Receiving bank' means the bank to which the sender's instruction is addressed.

---

[6] Division 11 does not apply to funds transfers governed by the Electronic Fund Transfer Act of 1978, title 15 United States Code section 1693 et seq., which concerns consumer accounts. (§§ 11102, 11108.)

[7] In its entirety, section 11104, subdivision (a), provides: " 'Funds transfer' means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order."

"(5) 'Sender' means the person giving the instruction to the receiving bank.

"(b) If an instruction complying with paragraph (1) of subdivision (a) is to make more than one payment to a beneficiary, the instruction is a separate payment order with respect to each payment.

"(c) A payment order is issued when it is sent to the receiving bank."

Under these definitions, it seems clear, and the parties do not dispute, that the four transactions involved in this case were funds transfers and, accordingly, division 11 of the California Uniform Commercial Code applies to them. (§ 11102.) The four orders requesting the Bank to draw funds out of the 298 Account and to wire them to the account at Chinatrust Bank were payment orders. Plaintiff Zengen was the sender. Defendant Bank was the receiving bank. The account that Yen opened at Chinatrust Bank under the name "Zengen, Inc.," was the beneficiary. The Bank was reimbursed for crediting the beneficiary account by debiting Zengen's account. Chinatrust Bank was the beneficiary's bank.

Section 11202, subdivision (a), provides: "A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency." Zengen alleges and, on review of summary judgment, we must accept as true, that the payment orders at issue were not authorized under this subdivision.

However, section 11202, subdivision (b), provides: "If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure,[8] a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is

---

[8] Section 11201 defines a "security procedure" as "a procedure established by agreement of a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication amending or canceling a payment order is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication. A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar security devices. Comparison of a signature on a payment order or communication with an authorized specimen signature of the customer is not by itself a security procedure."

not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted."

Under section 11202, subdivision (b), if a bank accepts an unauthorized payment order in good faith, it is not liable if a commercially reasonable security procedure was in place, and the bank followed it and any other applicable written agreement or instruction of the customer. (See 3 White & Summers, Uniform Commercial Code (4th ed. 1995) § 24-5, p. 79.) Zengen alleges that the Bank did not follow the security procedure that was in place because it did not obtain verbal authorization from Liu, as the funds transfer authorization agreement required. Because the trial court granted summary judgment for the Bank on other grounds, this question has not been litigated in this case.

Section 11204, subdivision (a), provides: "If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under Section 11202, or (ii) not enforceable, in whole or in part, against the customer under Section 11203,[9] the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund. However, the customer is not entitled to interest from the bank on the amount to be refunded if the customer fails to exercise ordinary care to determine that the order was not authorized by the customer and to notify the bank of the relevant facts within a reasonable time not exceeding 90 days after the date the customer received notification from the bank that the order was accepted

---

[9] Section 11203 provides: "(a) If an accepted payment order is not, under subdivision (a) of Section 11202, an authorized order of a customer identified as sender, but is effective as an order of the customer pursuant to subdivision (b) of Section 11202, the following rules apply:

"(1) By express written agreement, the receiving bank may limit the extent to which it is entitled to enforce or retain payment of the payment order.

"(2) The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like.

"(b) This section applies to amendments of payment orders to the same extent it applies to payment orders."

It is not clear that this section is relevant to this case although, as noted, the trial court granted summary judgment on other grounds so questions such as this have not been litigated.

or that the customer's account was debited with respect to the order. The bank is not entitled to any recovery from the customer on account of a failure by the customer to give notification as stated in this section." Zengen is seeking a refund from the Bank under this provision.

■ Section 11505 provides that the customer must notify the bank within one year after receiving notice of a payment order of its objection to the payment in order to obtain a refund. This provision is at the heart of the second issue before us on review.

B. *Whether the California Uniform Commercial Code Displaces Zengen's non-California Uniform Commercial Code Causes of Action*

Zengen filed this lawsuit seeking reimbursement from the Bank for the $4.6 million that Yen caused the Bank to transfer to his account at Chinatrust Bank. One of its causes of action is for a refund under the California Uniform Commercial Code. It has also alleged common law causes of action for breach of contract, negligence, return of deposit, and money had and received. Zengen bases each cause of action on its claim that the Bank should not have accepted the fraudulent payment orders. We must decide whether the California Code has fully occupied the field of this litigation and displaced the non-California Code causes of action.

The California Uniform Commercial Code does not automatically displace all other legal principles. Section 1103, subdivision (b), which applies to the entire California Code, provides: *"Unless displaced by the particular provisions of this code,* the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions." (Italics added.)

Thus, other principles of law will apply here unless some particular provisions of the California Uniform Commercial Code have displaced them. The Bank contends that division 11 has displaced the other causes of action. Section 11102 provides that division 11 "applies to funds transfers defined in Section 11104." The parties do not dispute that the funds transfers at issue here are funds transfers to which division 11 applies. The question before us, however, is not whether division 11 applies, but whether it applies *to the exclusion* of other legal principles giving rise to other causes of action.

As the Court of Appeal noted, "sections 11201 through 11204 provide a detailed scheme for analyzing the rights, duties and liabilities of banks and

their customers in connection with the authorization and verification of payment orders. Analysis of a funds transfer under these sections results in a determination of whether or not the funds transfer was 'authorized,' and provides a very specific scheme for allocation of loss." The Uniform Commercial Code Comment (hereafter, sometimes, Code Comment) explains why this is so.

The Code Comment to Uniform Commerical Code section 4A-102, adopted in California as section 11102, states: "In the drafting of Article 4A [i.e., division 11], a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

"Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. *The rules* that emerged represent a careful and delicate balancing of those interests and *are intended to be the exclusive means* of determining the rights, duties and liabilities of the affected parties *in any situation covered by particular provisions* of the Article. *Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.*" (Code Com., reprinted at 23D West's Ann. Cal. U. Com. Code (2002) foll. § 11102, pp. 27–28, italics added.)

Because, in enacting division 11, the Legislature adopted article 4A of the Uniform Commercial Code exactly as written, this Code Comment is persuasive in interpreting the statute. (See *People v. Martinez* (2000) 22 Cal.4th 106, 129 [91 Cal.Rptr.2d 687, 990 P.2d 563] [comments of the Law Revision Commission are persuasive of legislative intent when the Legislature adopts a law exactly as the commission proposed].)

Witkin explains the need that existed for a comprehensive statute: "The focus of [article 4A] is a type of payment, commonly referred to as a

'wholesale wire transfer,' which is used almost exclusively between business or financial institutions. Payments made by wire transfer, as distinguished from payments made by checks or credit cards, or from electronically based consumer payments, require a separate body of law that addresses the unique operational and policy issues presented by the method. *It was therefore the intent of the drafters of Article 4A to provide a comprehensive body of law to govern the rights and obligations resulting from wire transfers.* [Citations.]

"A typical funds transfer involves a large amount of money, multimillion-dollar transactions being common. Most transactions are completed in a single day; thus, funds transfers are efficient substitutes for payments made by delivery of paper instruments. An additional feature is low cost, in that transfers involving millions of dollars can be made for a few dollars. However, in the event a problem arises, risk of loss to banks may be high. Thus, *'a major policy issue in the drafting of Article 4A is that of determining how risk of loss is to be allocated given the price structure in the industry.'* [Citation.]" (4 Witkin, Summary of Cal. Law, *supra*, § 132, p. 505, italics added.)

In light of these authorities, we agree with the Court of Appeal that "division 11 provides that common law causes of action based on allegedly unauthorized funds transfers are preempted in two specific areas: (1) where the common law claims would create rights, duties, or liabilities inconsistent with division 11; and (2) where the circumstances giving rise to the common law claims are specifically covered by the provisions of division 11."

Courts from other jurisdictions have reached similar conclusions in considering the provisions of Uniform Commerical Code article 4A. (*Grain Traders, Inc. v. Citibank, N.A.* (2d Cir. 1998) 160 F.3d 97, 103; *Community Bank, FSB v. Stevens Financial Corp.* (N.D.Ind. 1997) 966 F.Supp. 775, 788; *Impulse Trading v. Norwest Bank Minn., N.A.* (D.Minn. 1995) 907 F.Supp. 1284, 1287–1288; *Fitts v. AmSouth Bank* (Ala. 2005) 917 So.2d 818, 824 ["if the situation made the basis of a dispute is addressed in Article 4A, then the provisions of Article 4A provide the exclusive rights and remedies of the parties involved"]; *Corfan Banco v. Ocean Bank* (Fla.Dist.Ct.App. 1998) 715 So.2d 967, 971; *Aleo Intl. v. Citibank* (N.Y.Sup.Ct. 1994) 160 Misc.2d 950 [612 N.Y.S.2d 540]; *Moody Nat. Bank v. Texas City Development* (Tex.Ct.App. 2001) 46 S.W.3d 373, 377–379.) As one court observed, "The uniformity and certainty sought by the statute for these transactions could not possibly exist if parties could opt to sue by way of [pre-Uniform Commercial Code] remedies where the statute has specifically defined the duties, rights and liabilities of the parties." (*Corfan Banco v. Ocean Bank, supra,* at p. 971, fn. 5.)

This is not to say that the Uniform Commercial Code necessarily displaces all common law actions based on all activities surrounding funds transfers. One court has explained that "[t]he exclusivity of Article 4-A is deliberately restricted to 'any situation covered by particular provisions of the Article.' Conversely, situations not covered are not the exclusive province of the Article." (*Sheerbonnet, Ltd. v. American Exp. Bank, Ltd.* (S.D.N.Y. 1995) 951 F.Supp. 403, 407–408.) The *Sheerbonnet* court held that the Uniform Commercial Code did not displace causes of action based on a bank's crediting funds from a payment order to the account of an insolvent company even though the bank knew the account had been frozen, and then asserting its own rights to the funds as an offset against debts owed to it by the insolvent account holder. (*Id.* at p. 405.) It concluded that no portion of the Uniform Commercial Code "directly addresses the allegations" of the case. (*Id.* at p. 412.) (See also *Centre-Point Merchant Bank v. American Express* (S.D.N.Y. 1996) 913 F.Supp. 202, 205–208 [Uniform Commercial Code displaces common law cause of action based on acceptance of fraudulent payment orders but not one based on failure to follow certain "rollover instructions" that were neither a "payment order" nor a "funds transfer"]; *Schlegel v. Bank of America* (2006) 271 Va. 542 [628 S.E.2d 362, 368] [Uniform Commercial Code displaces "common law claims as they relate to the alleged unauthorized payment orders" but not common law claims arising from the freezing of funds without refunding them to a certain bank account].)

■ Here, the gravamen of each of Zengen's causes of action against the Bank, including the one based on the California Uniform Commercial Code, is the same: The Bank should not have accepted and executed the fraudulent payment orders. Primarily, it alleges the Bank violated the funds transfer authorization agreement by not obtaining verbal authorization from Liu. The California Code squarely covers the question who should bear the loss when a bank executes an unauthorized payment order. Zengen argues that the California Code does not cover its negligence cause of action because it alleges a number of circumstances that should have caused the Bank to become suspicious and discover the fraud, including the fact that the funds authorization agreement did not specifically list the 298 Account by number. It asserts that these facts "have nothing to do with the *transactional* aspects of funds transfers." We disagree. As the Court of Appeal explained, "Although the California Uniform Commercial Code does not catalog all the ways in which a bank may execute an unauthorized wire transfer, it certainly specifies the consequences for doing so. Section 11201 et seq. sets forth the respective rights, duties and liabilities of the parties upon the issuance and acceptance of a payment order under division 11." To adapt the conclusion of one court to this case, "[b]ecause the situation made the basis of the [plaintiff's] common-law claims—that [the Bank] made an improper funds

transfer—is unequivocally addressed in the particular provisions of Article 4A, we conclude that those common-law claims are displaced by Article 4A and that the [plaintiff's] exclusive remedy for that claim must be found in Article 4A." (*Fitts v. Amsouth Bank, supra,* 917 So.2d at p. 824, fn. omitted.)

Regarding its breach of contract cause of action, Zengen argues that the Bank contractually agreed to execute a payment order "only in strict accordance with Zengen's instructions," and that it breached this agreement. Again, the California Uniform Commercial Code covers this subject matter and this transaction; it provides specific rules and remedies for the failure to follow a security procedure. Zengen also notes that the California Code expressly states that "[e]xcept as otherwise provided in this division, the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party." (§ 11501, subd. (a); see *Hedged Inv. Partners v. Norwest Bank Mn.* (Minn.Ct.App. 1998) 578 N.W.2d 765, 771 [Uniform Commercial Code does not displace contractual cause of action based on an agreement that "covers specific fiduciary responsibilities that go well beyond the scope of wire transfer services"].) We need not explore whether and how this provision might apply to the rights and obligations involved here. (See, e.g., *Regatos v. N. Fork Bank* (2005) 5 N.Y.3d 395 [838 N.E.2d 629, 804 N.Y.S.2d 713] [one-year notification time period may not be modified by contract].) In this case, Zengen does not allege any contractual agreement to change the parties' rights and obligations to a funds transfer. It relies solely on the business signature card and funds transfer authorization agreement, neither of which contains any agreement to modify the California Code's provisions.[10]

"In sum," as the Court of Appeal concluded, "the facts of this case fall squarely within the provisions of division 11 of the California Uniform Commercial Code. This case is about unauthorized wire funds transfers. Zengen's non-California Uniform Commercial Code causes of action are based solely on the analysis prescribed by division 11—that the Bank processed unauthorized payment orders. Because the California Uniform Commercial Code provides a remedy to Zengen under these circumstances, it preempts the common law causes of action alleged in the Zengen's complaint."

---

[10] In support of its argument that division 11 does not displace its common law causes of action, Zengen also relies on *Sun'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920]. That case involved different sections of the California Uniform Commercial Code and was decided over a decade before the Legislature enacted division 11. It is irrelevant to the proper interpretation of division 11.

C. *Whether Zengen Is Precluded from Recovering Under the California Uniform Commercial Code Because It Failed to Notify the Bank in Time of Its Objection*

Section 11505 provides: "If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of *the customer's objection to the payment* within one year after the notification was received by the customer." (Italics added.) We must decide exactly what the italicized words mean. Specifically, we must decide whether (1) it suffices for the customer to notify the bank that the payment orders were unauthorized or fraudulent (Zengen's position), or (2) the customer must object to the bank's action in debiting the customer's account or otherwise receiving payment from the customer (the Bank's position).

■ We conclude that, properly understood, the Bank's legal position is correct. The customer need not precisely state in so many words that it objects to the debiting of its account, but it must inform the bank in some fashion it believes the bank should not have accepted the payment order or otherwise is liable for the loss. Under the California Uniform Commercial Code, a bank is not necessarily liable for accepting an unauthorized, or even fraudulent, payment order. Accordingly, merely informing the bank the payment order was fraudulent does not inform it that the customer considers it liable for the loss.

■ We begin our analysis with the Uniform Commercial Code Comment to section 4A-505, adopted in California as section 11505, which, as noted above, is highly persuasive in interpreting the statute. That Code Comment notes that section 11505 "is in the nature of a statute of repose for objecting to debits made to the customer's account." It explains that in some circumstances, the receiving bank may be obliged to refund a payment made pursuant to a customer's payment order. It concludes by stating, "Under 4A-505 [i.e., section 11505], however, the obligation to refund may not be asserted by the customer if the customer has not objected *to the debiting of the account* within one year after the customer received notification of the debit." (Code Com., reprinted at 23D West's Ann. Cal. U. Com. Code, *supra*, foll. § 11505, p. 110, italics added.) The italicized language indicates the customer must object to *what the bank did*, not merely inform the bank the payment order was unauthorized.

Moreover, as the Bank notes, section 11505 requires an objection to the "payment" not the "payment order." That section contains only one sentence.

The sentence begins with the words, "If a receiving bank has received *payment* from its customer . . . ." (Italics added.) The portion at issue here requires the customer to notify the bank of its "objection to the *payment* . . . ." (Italics added.) In context, it is clear that both italicized words, "payment," refer to the same thing—the payment the bank received from its customer. Throughout this statutory scheme, the California Uniform Commercial Code distinguishes between the payment and the payment order. (See, e.g., § 11204 [referring to a refund of "any payment of the payment order"].) The Bank received this payment when it debited Zengen's 298 Account. (See § 11103, subd. (a)(1)(ii).) As indicated in the Code Comment to section 11505, it is this payment, that is, this debiting, to which the customer must object within one year of receiving notice of the payment order. Given the care with which the Uniform Commercial Code was drafted, and the goal stated in the Code Comment to section 11102 to use throughout division 11 "precise and detailed rules," we must interpret section 11505 to mean what it says. Merely stating that the payment order was unauthorized is not enough.

■ This conclusion is bolstered by the fact that the California Uniform Commercial Code sometimes requires the customer to notify the bank "of the relevant facts" within a shorter period than one year or face certain consequences. The section that Zengen relies on in seeking a refund provides an example. Section 11204 generally requires a bank that is required to refund a payment also to pay interest on the payment from the date the bank received it to the date of the refund. However, in order to be entitled to this interest, the customer must exercise ordinary care and "notify the bank of the relevant facts within a reasonable time not exceeding 90 days" after the customer received notification of the payment. (See also § 11304 [another example of a "relevant facts" notification requirement].) Notifying the bank that the payment orders were fraudulent might be notifying it of the relevant facts, but section 11505's one-year notification requirement must mean something different than merely notifying the bank of the relevant facts. In context, the difference is that section 11505 requires notification that the bank may be liable for the loss.

Good reason exists for the California Uniform Commercial Code to require only that the customer inform the bank promptly—within 90 days at most—of the relevant facts in order to receive interest on the refund, but to require it to notify the bank of its objection to the bank's action within one year. Prompt notification of the relevant facts can ensure that the bank does not accept any additional unauthorized payment orders. Here, after Zengen first notified the Bank of the relevant facts, Zengen and Bank officials worked together both to figure out what had happened (Yen had absconded with Zengen's financial records) and to make sure it did not happen again. But just informing a bank of the relevant facts does not necessarily inform it that it

may become a defendant in civil litigation. The California Code requires this additional notification within a year.

■ Zengen argues that "businesspeople like those employed by Zengen are businesspeople, not lawyers, and especially not lawyers educated in the esoteric principles of the law of funds transfers," and they cannot be expected to know that the bank is liable for the loss. It also argues that a customer might not know "for an extended period of time" that it has a basis for a claim against the bank. The statute, however, does not require precipitate action. It gives the customer only a maximum of 90 days to notify the bank of the relevant facts in order to receive interest, but it allows a full year to object to the payment. One year is a substantial period of time. Indeed, it is the statutory time limit within which to commence some actions including, for example, an action "by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement . . . ." (Code Civ. Proc., § 340, subd. (c).) ■ California Uniform Commercial Code section 11505 is not a statute of limitation but merely a statute of repose. (See Code Com., reprinted at 23D West's Ann. Cal. U. Com. Code, *supra*, foll. § 11505, p. 110.) It requires the customer only to notify the bank of the claim, not actually to commence the action. It is reasonable to require the customer to discover potential liability and notify the bank of a claim within a year of receiving notice of the payment.

This interpretation of section 11505's notice requirement is consistent with the Uniform Commercial Code's drafters' concern that "parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately." (Code Com., reprinted at 23D West's Ann. Cal. U. Com. Code, *supra*, foll. § 11102, p. 27.) Reasonably prompt notification of a claim against the bank is important so the bank can investigate the matter, prepare a defense, anticipate possible liability, and take steps to guard against similar future liability. Here, for example, the main factual basis for Zengen's claim for a refund is that the Bank did not follow the agreed security procedure of obtaining *verbal* authorization from Liu. Such a claim is best investigated reasonably promptly while memories are fresh.

■ Zengen also argues that section 11202, subdivision (b), requires the bank to prove an affirmative defense in order to avoid having to refund a payment of an unauthorized payment order. It argues that, because of this, a bank is always liable for accepting an unauthorized payment order unless it proves otherwise and, thus, informing the bank of the unauthorized payment order is tantamount to informing it that it is liable for the loss. We need not decide the exact meaning of section 11202 in this regard for it does not matter in interpreting section 11505. The fact remains that under the

California Uniform Commercial Code a bank may or may not be liable for the payment depending on the circumstances. Section 11505 requires notice in some form that the bank may be liable for the loss; what procedure applies to deciding whether the bank is, indeed, liable is irrelevant to what the notice must contain.

 Section 11505's notice requirement is not technical. The purpose of the notification requirement is to inform the bank reasonably promptly that the customer believes it is liable for the loss. That way, the bank knows it should take appropriate steps to protect itself. The customer's notice need only be sufficient to satisfy this purpose. The customer does not have to state specifically that it objects to the debiting or otherwise use any particular words. While it would certainly be preferable and clearer, and might avoid unnecessary litigation, for the customer to tell the bank expressly that the bank erred in processing the payment orders, or that it is liable for the loss, or use some other clear language, such specific words are not always necessary. What is necessary is that the customer convey to the bank in some way that it objects to what the bank did or, stated slightly differently, it must in some way assert a claim against the bank. Whether the notification is sufficient in a given case depends on the overall circumstances.

We think the test should be whether, under all of the relevant circumstances, a reasonable bank would understand from the customer's communication that the customer was objecting to what the bank had done in accepting the payment orders or otherwise considered the bank liable for the loss. If a reasonable bank would so understand the communication, it would know it should take appropriate steps to protect itself, thus satisfying the purpose behind section 11505.

In this case, Zengen arguably did more than just inform the Bank the payment orders were unauthorized. Liu testified that he told Julie Yen *he* had not authorized the transactions, testimony that might be significant in light of the provisions of the funds transfer authorization agreement. Additionally, Liu testified that, at some uncertain time, he and Julie Yen had engaged in a "very general discussion . . . about bank being sued." The Court of Appeal did not decide the adequacy of Zengen's notification in light of the test we have expressed, and the parties have not briefed the question. We think it best to allow the Court of Appeal to apply the test in the first instance. (See *People v. Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Accordingly, we will reverse its judgment and remand the matter to give it the opportunity to do so.

## III. Conclusion

We reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.