[No. G043874. Fourth Dist., Div. Three. June 29, 2011.]

WELLS FARGO BANK, N.A., Plaintiff, Cross-defendant and Appellant, v. FSI, FINANCIAL SOLUTIONS, INC., Defendant, Cross-complainant and Respondent.

## Counsel

Barton, Klugman & Oetting, Charles J. Schufreider and Mark A. Newton for Plaintiff, Cross-defendant and Appellant.

Daniel H. McLinden for Defendant, Cross-complainant and Respondent.

## Opinion

**IKOLA, J.**—FSI, Financial Solutions, Inc. (FSI), deposited a $90,000 check into its account at Wells Fargo Bank, N.A. (Wells Fargo). Ultimately, the check was dishonored by the third party payor bank because the account upon which the check was drawn had been closed months earlier. In the interim, FSI transferred most of the $90,000 out of its account to pay off preexisting debts. Wells Fargo "charged back" the remaining funds in FSI's account after discovering the check had been dishonored. Wells Fargo and FSI then sued each other pursuant to various causes of action. In a bench trial, the trial court entered judgment in favor of FSI on a promissory estoppel theory, finding FSI was entitled to the $90,000 because of misrepresentations by Wells Fargo to FSI about the status of the check during processing.

■ We reverse. Although substantial evidence supports a conclusion Wells Fargo acted negligently (in its delayed processing of the check and in representations to FSI concerning the status of the check), substantial evidence does not support a conclusion FSI was harmed to the extent reflected in the judgment.

## FACTS

*Undisputed Facts*

The parties submitted a joint statement of stipulated facts in advance of the bench trial, from which we set forth the material quoted in this section.

"FSI opened its checking account . . . with Wells Fargo bank (the 'Account') on March 29, 2006." "The check which is the subject of this litigation . . . was issued on November 10, 2006, made payable to FSI in the amount of $90,000 and was drawn by Bay Capital Corp. on an account at an Arizona branch of Bank One/J.P. Morgan Chase ('J.P. Morgan Chase') (the 'Check')."

"FSI first deposited the Check to the Account on November 30, 2006." "The Check was returned by J.P. Morgan Chase unpaid because of nonsufficient funds." "FSI again deposited the Check to the Account on December 27, 2006." "The Check was again returned by J.P. Morgan Chase unpaid because of nonsufficient funds on January 2, 2007."

"Thereafter, on March 22, 2007, FSI sued the maker of the Check, Bay Capital Corp., and that suit was dismissed without any recovery by FSI."

"On November 21, 2007, the day before the Thanksgiving Day holiday, FSI again deposited the Check to the Account by an ATM [(automated teller machine)] transaction."[1] "The Check as deposited to the Account [on] November 21, 2007 was a 'legal copy' of the original check."[2] "On November 23, 2007, Wells Fargo sent notice to FSI of a hold on the Check, which advised FSI in writing that $89,900 of funds from the $90,000 November 21, 2007 deposit to the Account would not be available until November 26, 2007."

---

[1] FSI's persistence in submitting dishonored checks on multiple occasions is not unprecedented. (See 2 White & Summers, Uniform Commercial Code (5th ed. 2008) Liability for NSF and Forged Checks, § 20-8, pp. 396–398 [examining cases in which a payee presents a dishonored check for payment on multiple occasions and observing, "[i]t seems unfair to allow a payee to stand beyond gun range and lob check after check into the fort in the hope he will eventually get a hit"].)

[2] Apparently, the original check was not returned to FSI after it was initially deposited in November 2006.

"On November 26, 2007, FSI transferred[:] $50,000 from the Account to the Wells Fargo account of W. & Z. Development Corp."; "$20,273.92 from the Account to pay down a credit line FSI had with Wells Fargo"; and "$10,000 from the Account to pay down two credit cards it maintained with Wells Fargo."

"As of November 26, 2007, the Check had not yet been forwarded for presentment to J.P. Morgan Chase." "Wells Fargo forwarded the Check for presentment to J.P. Morgan Chase via the Federal Reserve Clearing House on November 29, 2007." "The Check was presented to J.P. Morgan Chase on December 3, 2007." "J.P. Morgan Chase returned the Check to the Federal Reserve clearing house on December 4, 2007." "Wells Fargo received a return advice and the Check from the Federal Reserve clearing house on December 5, 2007." "The Check when returned to Wells Fargo bank by J.P. Morgan Chase, unpaid, on December 5, 2007, was marked 'unable to locate account.' " "The J.P. Morgan account, against which the Check had been drawn, had been closed since March, 2007."

"On December 5, 2007 Wells Fargo charged back the Account $90,000 which ultimately resulted in the $28,926.37 balance in the Account being paid to Wells Fargo and the Account having a negative balance of $62,764.73 as of January 31, 2008."[3] "On and after December 6, 2007 Wells Fargo Bank rejected payment on several checks and electronic transactions written or initiated by FSI on the Account in the total sum of $18,355.58 and charged $748.00 for their return."

*Pleadings*

Wells Fargo sued FSI on October 6, 2008, alleging the following causes of action: (1) overdrafts (breach of contract); (2) money had and received; (3) indebtedness; and (4) unjust enrichment. Wells Fargo alleged FSI was subject to an account agreement Wells Fargo attached to the complaint, which FSI breached by failing to pay for amounts owed as a result of the dishonored $90,000 check.

FSI filed a cross-complaint, alleging the following causes of action: (1) violation of California Uniform Commercial Code section 4214; (2) material misrepresentation; (3) negligent misrepresentation; and (4) promissory estoppel. The court sustained a demurrer with regard to the second cause of action.

---

[3] Trial exhibit 19, included in the appellate record, is a copy of a written December 5, 2007 notification from Wells Fargo to FSI, which states in relevant part: "The check . . . was returned unpaid. As a result, we deducted the amount of the check from your account. A Cashed/Deposited Item Returned. Unpaid fee was also deducted for the occurrence. After the check and fee were deducted, your account became overdrawn."

*Witness Testimony*[4]

Janet Gifford, a regional service manager for Wells Fargo, testified for her employer. Gifford explained that the check, having been deposited by ATM, would have gone to "our ATM processing department [in El Monte, California,] which we call EAPD." By custom and practice, "[i]t would be removed from the envelope that the customer placed the check in, and it would be processed by the process division at EAPD." Typically, EAPD employees remove checks from ATM envelopes and immediately (the same day) transmit such checks electronically to the clearing house. The ordinary processing time for clearing a check in the same region as California (including Ariz.) is two days "from the time that EAPD processes the check and gets it into the stream." Wells Fargo applied a two-business-day hold on the check, from November 21 to November 26, 2007.

Gifford had no personal knowledge of why there was a delay with regard to this check, and had been unable to determine who at EAPD handled the check. She did note that a "legal copy" of a check (like the one deposited by FSI) can be used as an original check for any purpose, but it does not have an MICR (magnetic ink character recognition) line on it. "At some point during the processing stream it would need to be handled by someone that would either put it in a carrier or put a stripe across . . . the bottom that would have the magnetic ink with the information from the check." As noted above, the parties stipulated the check was not presented to the clearing house until November 29, 2007. Gifford had no answer for why this delay occurred.

Michael Dean Horton, a former Wells Fargo area manager, also testified (he was called to testify by FSI). He testified that, on Monday, November 26, 2007, he spoke by telephone with FSI President Ryan Zeber with regard to the $90,000 check. Horton and Zeber were social acquaintances before their banking relationship began. Horton followed his "usual process" upon receiving Zeber's inquiry and checked two Wells Fargo "proprietary systems." "From both of those systems what it showed is that the hold had been released and the funds were showing available for use." On direct examination, Horton's testimony suggested Zeber asked whether the "funds had cleared," and Horton responded to the effect that "yes, the funds on the hold had been released and so that assumes that the funds had cleared and had been made available."

Horton acknowledged on cross-examination that both the placement and removal of a hold is automated; the hold is simply released electronically

---

[4] With one exception (exhibit 19, a copy of the Dec. 5, 2007 notification sent to FSI that the check was returned unpaid), the appellate record does not include the exhibits introduced at trial. Thus, our recitation of the facts is necessarily limited to the stipulated facts and witness testimony.

absent intervention by a Wells Fargo employee. Horton then acknowledged he did not recall the precise words he used in his conversation with Zeber, and "the substance of what [he] intended to communicate to Mr. Zeber was that now these $90,000 in funds were available for [Zeber] to draw down on . . . ."

Horton opined (the court overruled various objections to this testimony) that, in looking at all of the circumstances pertaining to the check, a two-day (business days) hold was improper according to usual procedures: "[T]his is a check that has been deposited previously. It's also an out of state check, and the client also did not have the amount of available [funds in the account to justify releasing the hold]. [¶] Under any of those three guidelines a hold of a minimum of five [business] days should have [been] placed on this check and [Wells Fargo] definitely had the right to adhere to a ten-day hold." Had Horton seen a copy of the actual check, he would have "advised Mr. Zeber that notwithstanding the fact that the hold may have been released, the check may well not ultimately clear."

Finally, Zeber testified. Zeber personally deposited the legal copy of the check at an ATM. On November 26, 2007, he "made a few phone calls." Zeber explained: "I called the 800 number on the back of my business banking ATM card to the customer service department to verify with the Wells Fargo Staff that . . . I was reading my on-line statement correctly, and that the check had cleared. [¶] I got reassurance from the customer service department that the check had cleared and [the] funds were available and clear. [¶] We also had the letter that said that the hold would be released on the 26th, so I went one step further and then called Mr. Horton. [¶] Mr. Horton had been my business banker for a few years, and I had a lot of confidence and trust in him, so I called him to verify that funds were actually clear." "I believe he placed me on hold and . . . he came back and said that the check had cleared and the funds were ready to be spent or used."

The following facts were admitted by Zeber on cross-examination: the $90,000 from Bay Capital "were loan commissions" received because "FSI was an agent for Bay Capital"; at the time the check was issued, "financially [Bay Capital was] a sinking ship"; and Zeber's explanation for the lack of success of FSI's suit against Bay Capital was FSI "had a venue issue."

As to the November 26, 2007 debits from the account, Zeber admitted the $50,000 transfer to W & Z Development was for purposes of paying off a preexisting loan ("[t]here were several notes payable and that was one of them, the oldest"); the $20,273.92 transfer was "for purposes of paying down a then existing obligation to Wells Fargo on a line of credit"; and two $5,000 transfers were separate payments to Wells Fargo credit card accounts on

amounts then owed. Smaller payments made out of the account during the November 26, 2007, to early December 2007 time period were "normal course of business, we had invoices due, and we made payments to our vendors" and employees.

There was no evidence presented by FSI regarding any credit rating effects or harm to vendor relationships as a result of the $18,355.58 in transfers dishonored by Wells Fargo after December 5, 2007. As noted above, however, FSI incurred $748 in overdraft fees.

*Judgment for FSI*

The court entered judgment in favor of FSI in the amounts of $28,926.37 (the amount Wells Fargo recovered from FSI's account after the check was dishonored) and $748 (penalties imposed on FSI for checks dishonored by Wells Fargo). The court also ordered Wells Fargo to "release forthwith the chargeback of $62,764.73 levied by [Wells Fargo] . . . against FSI's bank account . . . ."[5] Basically, the court found Wells Fargo now owned the check (and the likely worthless right to recover payment from Bay Capital). Finally, the court awarded FSI $36,150 in attorney fees and $500 in costs.

The court explained its ruling orally. "The court . . . finds for . . . [FSI] on the basis only of promissory estoppel . . . ." The court found several "clear and unambiguous" statements by Wells Fargo agents. As to what those statements were, the court found: "[T]he bank stated that there would be a hold from 11/21/07 to 11/26/07 . . . ." Next, Zeber "contacted two people in the bank; one was the initial contact on November 26th indicating . . . information that the check had cleared, [that] it was available. [¶] Receiving a positive report, [Zeber] then contacted Mr. Horton, and . . . Horton . . . ran [a] program [that] showed . . . the check had cleared, that the funds were available, and so he reported that to Mr. Zeber."

The court also found reasonable and foreseeable reliance, in light of the multiple confirmations by Wells Fargo of the status of the check. As to damages, the court observed: "[Zeber] relied on it, and he discharged obligations that were owing to others by FSI, the alleged payee on the check. [¶] I believe under those circumstances that . . . does denote to damage. I understand the argument of Wells Fargo's attorney that the balance sheet doesn't change, only in this instance it does change to the exten[t] of $28,926.37 . . . and as ordered, $748. And the court further orders . . . the attempt to take the $62,764.73 be discharged and no further conduct be taken on that."

---

[5] The numbers in the parties' stipulation of undisputed facts and the judgment do not seem to add up ($28,926.37 plus $62,764.73 equals $91,691.10, not $90,000, or $90,748). Given our disposition of this matter, we need not concern ourselves with this unexplained discrepancy.

The court denied Wells Fargo's motion for new trial, which contended there was no evidence of damages to FSI in the record (other than, perhaps, the overdraft fees imposed).

## DISCUSSION

Wells Fargo argues on appeal (as it did in its new trial motion) that substantial evidence does not support the judgment because Wells Fargo's mishandling of the check and concomitant statements to FSI about the status of the check did not result in any harm to FSI—other than, perhaps, the overdraft fees ($748).[6] In short (1) no matter how quickly Wells Fargo had presented the check to the Federal Reserve clearinghouse, the check never would have been paid by J.P. Morgan Chase (the payor bank) because Bay Capital's account had closed down many months before and (2) FSI's transfer of the $90,000 cannot amount to damages, particularly because the amounts spent went to discharge preexisting debts. In essence, FSI racked up a bigger debt to Wells Fargo than it had before this snafu, but these liabilities were offset on its balance sheet by the discharge of preexisting debt to Wells Fargo and another creditor (W & Z Development).

FSI counters that Wells Fargo "bought the check" as a result of its negligence, without regard to proof of recoverable damages suffered by FSI. FSI contends in its brief: "Based on the lapse of time involved (14 days) between deposit and return, and given the bank's interim statement that the check had cleared, the bank deprived itself of its chargeback rights long before it wrongfully invaded its customer's account on December 5, 2007." According to FSI, if a bank does not follow an appropriate timeline with regard to check processing and misrepresents the status of the check during such processing, the bank forfeits any rights it may have had to push the losses associated with the nonpayment of a check back onto the payee (here, FSI) and must instead pursue the maker of the check (here, Bay Capital) if it wishes to recover the amount of the check (here, $90,000).

We turn first to a discussion of the law of bank deposits and collections under the California Uniform Commercial Code.[7]

*Check Settlement*

There is a well-defined process for the "settlement" (payment) of an "item" (here, the check) deposited by a "customer" (here, FSI) at a "depositary

---

[6] It was for the trial court to weigh credibility (including the intent of the relevant individuals and the reasonableness of FSI's reliance on alleged representations by Wells Fargo employees). Thus, it is understandable that Wells Fargo has opted to argue only the damages issue on appeal.

[7] All statutory references are to the California Uniform Commercial Code.

bank" (here, Wells Fargo, which is also a "collecting bank"), which transmits the "item" to the "payor bank" (here, J.P. Morgan Chase).[8]

■  " 'When a customer deposits a check drawn on another bank, the customer receives a provisional credit for the amount of the check. [Citations.] . . . The collecting bank, acting as the customer's agent, then forwards the check to the payor bank or a presenting bank which gives the collecting bank a provisional credit. [Citation.] If the check is forwarded to a presenting bank, the presenting bank in turn presents the check to the payor bank from which the check is to be drawn and receives a provisional credit. If the payor bank does not promptly dishonor the check, the provisional settlements throughout this chain of banks become final.' " (*Holcomb v. Wells Fargo Bank, N.A.* (2007) 155 Cal.App.4th 490, 497 [66 Cal.Rptr.3d 142] (*Holcomb*).)

There is no evidence in this case that the provisional settlements of the check throughout the chain of banks became final.[9] Once it received the check, J.P. Morgan Chase promptly dishonored it. Thus, the provisional settlements made through the chain of banks did not become final but instead were reversed. Had Wells Fargo received a final settlement for the check, it would have been "accountable to [FSI] for the amount of the item and any provisional credit given for the item in an account with [FSI would have become] final." (§ 4215, subd. (d).) But this did not happen.

It is presumed a depositary/collecting bank does not intend to purchase a check from its customer simply by crediting its customer with a provisional

---

[8] " 'Settle' means to pay in cash, by clearinghouse settlement, in a charge or credit or by remittance, or otherwise as agreed. A settlement may be either provisional or final." (§ 4104, subd. (a)(11).) " 'Item' means an instrument or a promise or order to pay money handled by a bank for collection or payment." (*Id.*, subd. (a)(9).) A "check" (§ 3104, subd. (f)) falls within the broad definition of "item." " 'Customer' means a person having an account with a bank or for whom a bank has agreed to collect items . . . ." (§ 4104, subd. (a)(5).)

" 'Depositary bank' means the first bank to take an item . . . ." (§ 4105, subd. (2).) " 'Payor bank' means a bank that is the drawee of a draft." (*Id.*, subd. (3).) " 'Collecting bank' means a bank handling an item for collection except the payor bank." (*Id.*, subd. (5).) " 'Presenting bank' means a bank presenting an item except a payor bank." (*Id.*, subd. (6).) " 'Intermediary bank' means a bank to which an item is transferred in course of collection except the depositary or payor bank." (*Id.*, subd. (4).) " 'Clearinghouse' means an association of banks or other payors regularly clearing items." (§ 4104, subd. (a)(4).) Clearly, many of the categories of banks are overlapping, and banks play different roles depending on their relationship to the maker and payee of the item.

[9] "An item is finally paid by a payor bank when the bank has first done any of the following: [¶] (1) Paid the item in cash. [¶] (2) Settled for the item without having a right to revoke the settlement under statute, clearing house rule, or agreement. [¶] (3) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule, or agreement." (§ 4215, subd. (a).) "If provisional settlement for an item does not become final, the item is not finally paid." (*Id.*, subd. (b).)

settlement: "Unless a contrary intent clearly appears and before the time that a settlement given by a collecting bank for an item is or becomes final, the bank, with respect to the item, is an agent or subagent of the owner of the item and any settlement given for the item is provisional." (§ 4201, subd. (a).)

■ Typically, if a payor bank dishonors a check, the collecting bank exercises its right to recover the amount of any provisional credit given to its customer for the dishonored item. "If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor . . . or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item . . . . These rights to revoke, charge back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final." (§ 4214, subd. (a).)

The depositary/collecting bank's right to revoke settlement/charge back/obtain a refund applies even if "the return [of the item] or notice [of dishonor by the payor bank] is delayed . . . ." (§ 4214, subd. (a).) "The right to charge back is not affected by either of the following: [¶] (1) Previous use of a credit given for the item. [¶] (2) Failure by any bank to exercise ordinary care with respect to the item . . . ." (*Id.*, subd. (d).) "A failure to charge back or claim refund does not affect other rights of the bank against the customer or any other party." (*Id.*, subd. (e).)

The relevant statutes are clear. Wells Fargo had the right under section 4214 to charge back or otherwise seek recovery of $90,000 from FSI based on J.P. Morgan Chase's dishonor of the check. (See *Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1465–1467 [275 Cal.Rptr. 871] (*Symonds*).) Wells Fargo did not receive a final settlement of the check through the chain of banks, which is the only way the right to charge back terminates. (§ 4214, subd. (a).) The right to charge back applies even if the customer has already used the "credit given for the item" (*id.*, subd. (d)(1)) or the bank failed to "exercise ordinary care with respect to the item" (*id.*, subd. (d)(2)). (See *Holcomb, supra*, 155 Cal.App.4th at pp. 497–498.) Thus, Wells Fargo was within its statutory rights when it successfully charged back $28,926.37. Wells Fargo also retained its contract and common law rights to seek recovery of the remainder of the $90,000.

*Offsetting Bank Liability for Negligence Under the California Uniform Commercial Code*

The issue in this case is whether Wells Fargo's negligence (the lengthy delay in the forwarding of the check to the Federal Reserve clearinghouse)

and/or alleged misrepresentations to FSI (about the status of the check having "cleared") resulted in the provisional settlement between Wells Fargo and FSI becoming "final" (in that Wells Fargo could not recover the $90,000 from FSI), *notwithstanding* the lack of finality in the settlement of the item in the chain of banks.

As shown above, Wells Fargo had the legal right under applicable law to charge back FSI's account for $90,000. But FSI has an offsetting right to recover damages against Wells Fargo (or avoid repaying the portion of the $90,000 that it had moved out of its account) to the extent Wells Fargo's negligence caused FSI to suffer losses. (§ 4214, subd. (a) [bank "is liable for any loss resulting from the delay" in returning item to customer or providing notice of dishonor]; *id.*, subd. (d)(2) [bank "remains liable" for failure "to exercise ordinary care"]; *Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163, 1171–1172 [118 Cal.Rptr.3d 866]; *Symonds, supra,* 225 Cal.App.3d at p. 1467 ["while [bank] may be entitled to charge back [customer's] account and seek a refund for its provisional settlement, it is not entirely free of liability"]; 2 White & Summers, Uniform Commercial Code, *supra,* Liability for NSF and Forged Checks, § 20-6, p. 384 ["In effect [section 4214] permits the collecting bank to hold the funds while it is determined whether it, or its customer, must bear the liability"].)

■ The statutory scheme imposes potential liability on banks for a variety of acts in the processing of checks. "A collecting bank shall exercise ordinary care in all of the following: [¶] (1) Presenting an item or sending it for presentment. [¶] (2) Sending notice of dishonor or nonpayment or returning an item . . . to the bank's transferor after learning that the item has not been paid or accepted, as the case may be. [¶] (3) Settling for an item when the bank receives final settlement. [¶] (4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof." (§ 4202, subd. (a).) "A collecting bank exercises ordinary care under subdivision (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness."[10] (§ 4202, subd. (b).) "A collecting bank shall send items by reasonably prompt method . . . ." (§ 4204, subd. (a).)

"The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have

---

[10] " 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." (§ 4104, subd. (a)(10).)

been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence." (§ 4103, subd. (e).) Thus, absent a finding of bad faith (which was not found here), the most Wells Fargo could be liable for is $90,000 under section 4103, subdivision (e). This amount should be "reduced by an amount that could not have been realized by the exercise of ordinary care." (*Ibid.*) In other words, when "some part or all of the item could not have been collected even by the use of ordinary care the recovery is reduced by the amount that would have been in any event uncollectible." (Cal. U. Com. Code, com. 6, reprinted at 23B pt. 1 West's Ann. Cal. U. Com. Code (2002) foll. § 4103, p. 37.) Here, the item was entirely uncollectible by the use of ordinary care; the Bay Capital account had been closed months earlier.

Section 4214, subdivision (a), provides that if "return [of the item] or notice [of dishonor] is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts . . . [the bank] is liable for any loss resulting from the delay." There is no evidence Wells Fargo dallied in providing notice to FSI of the check's dishonor *after* the check was actually dishonored by J.P. Morgan Chase. FSI contends it can recover damages under section 4214, subdivision (a), based on the delay in submitting the check to the payor bank (the delayed submission resulted in a delayed notice of dishonor). Even if recoverable outside the context of section 4103, subdivision (e), such damages would be limited to "any loss resulting from the delay."

*Bank Liability Pursuant to Alternative Causes of Action*

FSI's operative cross-complaint alleged causes of action for violation of the California Uniform Commercial Code, negligent misrepresentation, and promissory estoppel. The discussion above pertains directly to the first cause of action, but also is necessary background for understanding the application of the other two causes of action.

■ "There is nothing in the [California Uniform Commercial] [C]ode prohibiting a claim based on a depositor's detrimental reliance on a bank employee's incorrect statements." (*Holcomb, supra*, 155 Cal.App.4th at p. 498.) In *Holcomb*, the customer alleged a bank manager negligently misrepresented that a deposit " 'had been verified,' " and that the customer could write checks against the deposit. (*Id.* at pp. 493–494.) The *Holcomb* court reversed the judgment against the customer, finding in part that the trial court erred by sustaining a demurrer to the customer's negligent misrepresentation action. (*Id.* at pp. 499–500, 503.) The *Holcomb* court also held the trial

court should afford the customer an opportunity to amend his complaint to separately allege negligence in the bank's handling of the check under the California Uniform Commercial Code. (155 Cal.App.4th at p. 502.)

■ Thus, FSI properly brought both a negligence claim (under the standards set forth in the Cal. U. Com. Code) and a negligent misrepresentation claim. "The elements of negligent misrepresentation are '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.' " (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50 [89 Cal.Rptr.3d 473].)

■ Unlike negligent misrepresentation, there is no precedent for a customer bringing a "promissory estoppel" cause of action against a depositary bank in these circumstances. " ' "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' " ' " (*Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218, 225 [120 Cal.Rptr.3d 507].) Equitable estoppel appears to be a more apt legal theory, as it pertains to misrepresentations of *existing fact* rather than *promises*. (*Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1566–1567 [69 Cal.Rptr.3d 612] [equitable estoppel also requires proof of reliance to the injury of party asserting doctrine].)

Regardless of the propriety of a promissory estoppel cause of action under the facts of this case, the issue raised by Wells Fargo on appeal is whether there is substantial evidence supporting the award of damages to FSI in the judgment (and the denial of Wells Fargo's request to recover the remainder of the $90,000 it did not already recover by way of charge back). Whether the legal theory is equitable estoppel, promissory estoppel, or negligent misrepresentation, any damages awarded to FSI (or avoidance of Wells Fargo's charge back rights) must be *losses caused by* Wells Fargo's misrepresentations and/or unfulfilled "promises." Wells Fargo's rights with regard to the $90,000 are not forfeited merely because Wells Fargo negligently misstated the facts.

*Damages*

■ We can find no evidence of cognizable damages in the record, other than the $748 in overdraft fees charged to FSI. "Whatever its measure in a

given case, it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 [105 Cal.Rptr.2d 88].)

There are at least four recognized types of loss that can be recovered by a customer as damages in a case like the instant one. First, a bank might negligently delay the submission of the check to the payor bank (as happened in this case), and such delay might *cause the dishonor of the check* (as did not happen in this case). (*Symonds, supra,* 225 Cal.App.3d at p. 1467 [customer alleged bank "was negligent in its handling of the . . . check and that, had the check been handled properly, there would have been sufficient funds on which final settlement would have been made"].) Here, there is no evidence Bay Capital's account had sufficient funds in November 2007, when FSI deposited the check. Instead, it is undisputed Bay Capital's account had been closed since March 2007. Wells Fargo's negligence had no causal effect on FSI's ability to collect $90,000 from Bay Capital's account.

Second, a bank might act negligently in its handling of the check or providing notice of dishonor of the check to the customer, and *thereby prejudice the customer's ability to recover payment* from the maker of the check. (See, e.g., *Appliance Buyers Credit Corp. v. Prospect National Bank* (7th Cir. 1983) 708 F.2d 290 [maker of check filed bankruptcy action day after customer received notice of dishonor, but no recoverable damages against depositary bank because no evidence customer could have recovered more money from the maker of check had customer received notice of dishonor one week earlier].) In the instant case, FSI's rights vis-à-vis Bay Capital were not prejudiced by Wells Fargo's negligence or misrepresentations.

Third, a customer might reasonably rely on a bank's inaccurate representations with regard to the status of a check *and, as a result, release something of value.* (See, e.g., *First Georgia Bank v. Webster* (1983) 168 Ga.App. 307, 307–308 [308 S.E.2d 579] [real estate broker, relying on bank's inaccurate representation that his client's $53,638 check was " 'good,' " paid other party (presumably the seller) $47,036 before the client's check was dishonored]; *First National Bank v. Ulibarri* (1976) 38 Colo.App. 428, 429–430 [557 P.2d 1221] [jeweler had valid defense of equitable estoppel against bank's action to recover value of dishonored check because jeweler released diamond to his customer after being told inaccurately by bank that check had " 'finally settled' "].) There is no evidence FSI provided new value to Bay Capital after being informed by Wells Fargo that the check had "cleared." To the contrary, it is undisputed Bay Capital's $90,000 check amounted to commissions for services rendered by FSI more than one year earlier.

Fourth, a customer might (1) reasonably rely on a bank's inaccurate representations with regard to the status of a check; (2) write checks that are subsequently dishonored by the customer's bank for lack of sufficient funds; and (3) as a result, suffer some form of harm. (See *Holcomb, supra*, 155 Cal.App.4th at p. 494 [customer's credit rating and relationship with vendors harmed as a result of bad checks written by customer following bank's alleged negligence and misrepresentations].) Here, Wells Fargo dishonored a series of post-December 5, 2007 attempted transfers by FSI. Moreover, Wells Fargo concedes the overdraft fees imposed by Wells Fargo ($748) amount to harm suffered by FSI, if FSI in fact reasonably relied on false representations by Wells Fargo when it attempted to make the dishonored transfers. But there is no evidence in the record establishing harm done to FSI as a result of the dishonor of $18,355.58 in transfers (e.g., damage to credit score, damage to vendor relationships).

The court did not rely on any of the foregoing theories of damages in entering judgment in FSI's favor. Rather, the court concluded FSI's receipt of $90,000 and expenditure of much of those funds on preexisting debts amounted to damages. We can imagine a record that would support the imposition of *some* measure of damages (although certainly not the entire principal amount) based on a customer's exchange of a favorable credit arrangement for a less favorable credit arrangement. (Cf. *Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 214–215 [187 Cal.Rptr. 231] [discussing possibility of damages for seller's delay based on differential between interest rate obtained by buyer of home and interest rate that could have been obtained had seller timely performed].) But there is no evidence FSI faced the prospect of paying higher interest rates as a result of paying off debt to W. & Z. Development and Wells Fargo, and replacing such debt with a new obligation to Wells Fargo. Moreover, there is no evidence in the record suggesting FSI could not utilize the same credit lines it paid off with the $90,000 to put itself back in the same position it was in prior to this imbroglio.

There is no substantial evidence supporting the relief ordered in the judgment. Other than overdraft fees, FSI was not made worse off as a result of Wells Fargo's negligence and misstatements. If the judgment were affirmed, it would result in a windfall to FSI. The judgment must be reversed. The evidence at trial established that Wells Fargo was entitled to recover from FSI the amount of the overdraft, $62,764.73, reduced by the overdraft fees of $748, for a net judgment in favor of Wells Fargo of $62,016.73. The attorney fees award must also be reversed, but the briefing on this issue was insufficient to determine the basis on which attorney fees are allowable. Accordingly, this issue will be determined by the trial court on remand.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a new judgment awarding Wells Fargo the sum of $62,016.73 against FSI, together with attorney fees, if any, to which Wells Fargo may be entitled after hearing on remand. Wells Fargo shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.