[No. E049170. Fourth Dist., Div. Two. Dec. 13, 2010.]

CHINO COMMERCIAL BANK, N.A., Plaintiff and Respondent, v. BRIAN D. PETERS, Defendant and Appellant.

## COUNSEL

Hanke & Williams and Rick D. Williams for Defendant and Appellant.

Perez & Hawes and Eric Everett Hawes for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Appellant Brian D. Peters is the victim of a Nigerian-style e-mail scam. He agreed that his corporation would receive money supposedly owed to a gentleman in Malaysia, and would then pay that money out at the gentleman's direction, in return for a 15 percent fee. His corporation received checks totaling $808,988.90 and deposited them in an account with respondent Chino Commercial Bank, N.A. (the Bank). It then had the Bank make wire transfers totaling $468,000 out of the account. All of the checks bounced, because they had been altered. This resulted in an overdraft. The Bank claims, and Peters does not dispute, that he was personally liable for any overdraft.

The Bank promptly obtained a right to attach order against Peters. Peters appeals from the right to attach order. He argues that the Bank had the burden of proving it did not act negligently and that it failed to carry this burden.

We will hold that, even assuming the Bank had the burden of proof, it introduced sufficient evidence that it did not act negligently in accepting the checks for deposit. We will further hold that the Uniform Commercial Code (UCC) precludes any claim that the Bank acted negligently in making the wire transfers. Accordingly, we will affirm.

## I

## FACTUAL BACKGROUND

Faux Themes Inc. (Faux) is a corporation in the construction business. In March 2008, it opened a checking account with the Bank. Both Peters and Marilyn Charlnoes were authorized signers on the account. Peters was the president of the corporation; Charlnoes was the treasurer of the corporation.

The written account agreement defined "you" and "your" as "the account holder and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account." It then provided: "Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts . . . ."

Until April 2009, the average monthly balance in the account ranged from $3,000 to $5,000; the deposits in any one month never exceeded about $10,000.

In March 2009, Peters received an e-mail supposedly from Husaine Norman, a citizen of Malaysia. Norman said that certain third parties in the United States and Canada owed him money; however, they were insisting that "they can not transfer the funds to any bank account outside America continent due to their new company policy." He asked Peters to "assist me in receiving the funds and forward to me." He offered to pay Peters 12 percent of the money. Peters agreed (apparently after negotiating an increase of his fee to 15 percent).

On April 30, 2009, Faux received a check for $178,000; Peters had Charlnoes deposit it. On May 8, 2009, the Bank confirmed that the check had cleared. Charlnoes then had the Bank wire $80,000 to a bank in Hong Kong.

Also on May 8, 2009, Faux received a second check, for $373,988.90; Peters had Charlnoes deposit it.

On May 12, 2009, Charlnoes had the Bank wire another $71,000 to the same bank in Hong Kong.

On May 15, 2009, the Bank confirmed that the second check had cleared, and Charlnoes had the Bank wire $317,000 to a bank in China. On May 21, 2009, Faux received a third check, for $257,000; Peters had Charlnoes deposit it.

On May 22, 2009, the Bank was notified that the first check had been altered, so as to change the name of the payee to Faux. On May 28, 2009, the

Bank was notified that the second and third checks had been similarly altered. Because all three checks were dishonored, the account was overdrawn in the total amount of $458,782.60.

Dann H. Bowman, the president of the Bank, met with Peters. Peters brought along all of his e-mail correspondence with Norman. Bowman told Peters that he "had been caught up in a check cashing scam." At one point, Peters remarked that his arrangement with Norman "seemed pretty fishy to me . . . but, times being what they are, I decided to take the chance." Peters testified, however, that he "did not knowingly participate in the scam . . . ." Indeed, he noted, he was a victim of the scam.

Under the Bank's procedures, whenever a check for more than $10,000 was deposited, the operations manager would review it to see, among other things, whether there were any irregularities on the front or back and whether the amount was consistent with the customer. These procedures were "consistent with industry procedures nationally . . . ."

The operations officer had initialed the deposit slips for the altered checks, which meant that these procedures had been followed when they were deposited. Moreover, the amounts of the checks were consistent with deposits that had been made to accounts of related entities.

When the Bank got back the original checks, it found that they had been altered "with an acid that was originally used by architects to remove ink from blueprints . . . ." They had no "facial irregularities"—"[n]o discolorations, smudges, misalignments or disturbances of the backgrounds or watermarks . . . ." The alterations were "in fonts and type sizes that were consistent [with] the other printing on the checks."

## II

## PROCEDURAL BACKGROUND

The Bank filed this action against defendants Faux, Peters, and Charlnoes, asserting causes of action for breach of contract and fraud. It then filed an application for a right to attach order, seeking to attach property of Peters and Charlnoes.

The Bank asserted a right to attach based on a "quasi contract claim" on "an overdraft." Peters responded that, under older California cases such as *Pac. Coast Cheese, Inc. v. Sec.-First Nat. Bk.* (1955) 45 Cal.2d 75 [286 P.2d 353], *Basch v. Bank of America* (1943) 22 Cal.2d 316 [139 P.2d 1], and *Glassell Dev. Co. v. Citizens' Nat. Bk.* (1923) 191 Cal. 375 [216 P. 1012], the

Bank could not recover unless it carried its burden of proving that it was free from negligence. The Bank replied that these cases were distinguishable, and, alternatively, that it had proven its own "freedom from fault." (Capitalization omitted.)

At the hearing on the application, the trial court noted that "[t]he recommendation from Research was to deny the [order] because of the allegations that Chino Commercial Bank was negligent . . . ." Nevertheless, it granted the right to attach order as to property of Peters, although it denied it as to property of Charlnoes.

The trial court essentially reasoned that Peters had the burden of proving that the Bank had been negligent, particularly as he had been negligent himself. It was concerned that Peters, despite being culpably negligent, "then looks to the Bank and says, 'You should have prevented me from doing that.' "

It concluded that the Bank had "met [its] burden . . . to . . . show that Mr. Peters was intricately involved in this." Peters, on the other hand, had not introduced sufficient evidence that the Bank was negligent: "Unless I have some better evidence [than] you saying, 'Well, they're negligent, too'—that doesn't prove anything."

III

THE TRIAL COURT PROPERLY FOUND THAT THE
BANK HAD DEMONSTRATED THE PROBABLE
VALIDITY OF ITS CLAIM

To grant the right to attach order, the trial court had to find that the Bank had established the "probable validity" of its claim. (Code Civ. Proc., § 484.090, subd. (a)(2).) "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (Code Civ. Proc., § 481.190.)

Peters is essentially challenging the trial court's implied finding of probable validity. To the extent that this presents a question of fact, we apply the deferential substantial evidence standard of review. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) "If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371].) " '[W]e must

consider the evidence in the light most favorable to the prevailing party, giving such party the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. [Citation.]' [Citation.]" (*Gooch v. Hendrix* (1993) 5 Cal.4th 266, 279 [19 Cal.Rptr.2d 712, 851 P.2d 1321].) To the extent, however, that the trial court's finding presents a question of law, we review it independently. (*Crocker National Bank*, at p. 888.)

An attachment must be based on a contract claim. (Code Civ. Proc., § 483.010, subd. (a).) Here, the Bank duly asserted a contract claim, based on the written account agreement, to recover an overdraft.[1] The Bank participated in creating the overdraft in two respects: (1) the Bank made the wire transfers, and (2) the Bank then reversed the deposit of the altered checks. If the Bank had no right to do one or the other or both, there was, in effect, no overdraft.

■ In the trial court, both sides relied exclusively on common law principles. California, however, has adopted the UCC, and the UCC expressly displaces common law, to the extent that its "particular provisions" apply. (Cal. U. Com. Code, § 1103, subd. (b).) "[T]he Uniform Commercial Code is the primary source of commercial law rules in areas that it governs . . . . Therefore, while principles of common law and equity may supplement provisions of the Uniform Commercial Code, they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies." (U. Com. Code com., 23A pt. 1 West's Ann. Cal. U. Com. Code (2010 supp.) foll. § 1103, p. 7.)

Accordingly, we must consider whether the UCC applies here, and if so, how.

A. *Negligence in Accepting the Altered Checks.*

First, we consider the Bank's alleged negligence in accepting the altered checks for deposit.

Initially, we considered whether UCC section 3-406, adopted in California as California Uniform Commercial Code section 3406, subdivision (a), applied to this case. UCC provides: "A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to

---

[1] Peters has not argued that he was not liable for Faux's overdrafts under the written account agreement. We deem any such contention forfeited for purposes of this appeal.

the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection."

Here, the Bank took the altered checks in good faith for collection. (See Cal. U. Com. Code, § 1201, subd. (b)(20) [defining "good faith"].) And both Faux and Peters failed to exercise ordinary care. Peters even concedes that he "was, shall we say, less than smart in moving forward on the transaction . . . ." It cannot be said, however, that their failure to exercise ordinary care contributed to the alteration of the checks.

UCC section 3-406 has been called the "negligent drawer defense." (*Guardian Life Ins. Co. of America v. Weisman* (3d Cir. 2000) 223 F.3d 229, 232.) The comment to this section lists a number of examples. In each of them, the ostensible drawer of a check has negligently failed to prevent the check from being forged or altered—by keeping a rubber signature stamp in an unlocked desk drawer, by mailing the check to a person with the same name as the intended payee, or by leaving large blank spaces after the typewritten amounts. (U. Com. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 3406, p. 437.)

We may assume, without deciding, that UCC section 3-406 could apply to a negligent person other than the drawer. Even if so, these examples illustrate how the negligence must causally contribute to the alteration or forgery. Here, the alterations had already occurred before the checks came into Peters's hands. Although his negligence did contribute to the success of the overall fraudulent scheme, it did not contribute to the alteration of the checks.

Hence, we must look to other provisions of the UCC. The ones we find controlling are those regarding the right of charge-back.[2] Under the UCC, each time the Bank credited Faux's account for an altered check, this was merely a provisional settlement. (Cal. U. Com. Code, § 4201, subd. (a).) Once the check was dishonored, the Bank had the right to revoke the

---

[2] The Bank has suggested that UCC sections 3-416 (Cal. U. Com. Code, § 3416) and 4-207 (Cal. U. Com. Code, § 4207) apply. Under these sections, the Bank has a claim against Faux for breach of warranty based on Faux's endorsement of the altered checks. (Cal. U. Com. Code, § 3416, subd. (a)(3).) The Bank has not explained, however, how it could assert this claim against Peters. Peters agreed, at most, to be liable for "overdrafts" and "charges" (which, in context, apparently meant items on the Bank's "schedule of charges," such as overdraft fees). He did not guarantee Faux's liabilities generally.

The Bank has also suggested that UCC section 4-401, subdivision (d) (Cal. U. Com. Code, § 4401, subd. (d)) applies. That subdivision relates to the duties of a bank on which an altered check has been drawn. (See generally 2 White & Summers, Uniform Commercial Code (5th ed. 2008), § 21-3, pp. 421–422.) It has nothing to do with the rights of a bank in which an altered check has been deposited.

provisional settlement and to charge back the amount of the credit. (Cal. U. Com. Code, § 4214, subd. (a).) Consistent with this principle, the written account agreement stated, "We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit . . . ."

■ "The right to charge back is not affected by . . . [¶] . . . [¶] . . . [f]ailure by any bank to exercise ordinary care with respect to the item, *but a bank so failing remains liable.*" (Cal. U. Com. Code, § 4214, subd. (d), italics added; see also *Holcomb v. Wells Fargo Bank, N.A.* (2007) 155 Cal.App.4th 490, 498, fn. 5 [66 Cal.Rptr.3d 142] ["[a]lthough retaining its right to charge back, a bank may nonetheless be held liable for harm stemming from its own negligence in handling an item"]; *Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1466–1467 [275 Cal.Rptr. 871].) Thus, the Bank could be liable for its failure to exercise ordinary care in accepting the altered checks for deposit.

This liability for failure to exercise ordinary care arises under the UCC; it differs from common law negligence to the extent set forth in the UCC. For example, the UCC provides that, subject to exceptions not applicable here, "action or nonaction consistent . . . with a general banking usage . . . is prima facie the exercise of ordinary care." (Cal. U. Com. Code, § 4103, subd. (c).)

The Bank introduced uncontradicted evidence that it did use ordinary care. The operations officer had looked for any irregularities on the face of the checks, but the alterations were not readily apparent. The operations officer had also considered whether the amounts of the checks raised a red flag, but the amounts were consistent with deposits to other companies owned and operated by Peters at the same address as Faux. These procedures were consistent with national standards for accepting checks for deposit. Peters did not introduce any contrary evidence.[3] Accordingly, the Bank established that it properly charged back the account for the altered checks.

B.   *Negligence in Making the Wire Transfers.*

We turn, then, to the Bank's alleged negligence in making the wire transfers. Peters argues that the Bank failed to prove that it was not negligent. He also argues that there was evidence that the Bank *was* negligent: The balance in

---

[3] Because the Bank affirmatively proved that it did use ordinary care, we need not decide whether cases holding that a bank has the burden of proof on this issue (e.g., *Basch v. Bank of America, supra,* 22 Cal.2d at p. 330) apply under the UCC.

Faux's account had historically been between $3,000 and $5,000, yet the transfers totaled $468,000 (and went to China).[4]

■ Subdivision (a) of UCC section 4-401, adopted in California as California Uniform Commercial Code section 4401, states that "[a] bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." This provision displaces a common law claim for negligent payment of an "item" on a customer's account. (*Joffe v. United California Bank* (1983) 141 Cal.App.3d 541, 557–558 [190 Cal.Rptr. 443].) A wire transfer, however, is not an "item." (Cal. U. Com. Code, §§ 4104, subd. (a)(9), 11103, subd. (a)(1); *Fernandes v. First Bank & Trust Co.* (N.D.Ill., Sept. 2, 1993, No. 93 C 2903) 1993 U.S.Dist. Lexis 12342, pp. *13–*15; *Myrin Institute, Inc. v. Internationale Nederlanden Bank NV* (S.D.N.Y., Dec. 17, 1992, No. 92 Civ. 5884 (PKL)) 1992 U.S.Dist. Lexis 19202, pp. *4–*7.)

Article 4A of the UCC (article 4A) governs funds transfers, which include wire transfers. (4 Witkin, Summary of Cal. Law (10th ed. 2005) Negotiable Instruments, § 132, p. 505.) Article 4A has been adopted in California as division 11 of the California Uniform Commercial Code.

"In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

■ "Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing

---

[4] Peters has not argued that the Bank's representations that the checks had cleared bar it from recovering. (See generally *Holcomb v. Wells Fargo Bank, N.A., supra,* 155 Cal.App.4th at pp. 496–500.) We deem any such contention forfeited for purposes of this appeal.

of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." (U. Com. Code com., 23D West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 11102, pp. 27–28.)

"This is not to say that the Uniform Commercial Code necessarily displaces all common law actions based on all activities surrounding funds transfers . . . . '[T]he exclusivity of Article [4A] is deliberately restricted to "any situation covered by particular provisions of the Article." Conversely, situations not covered are not the exclusive province of the Article.' [Citation.]" (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 254 [59 Cal.Rptr.3d 240, 158 P.3d 800].)

■    Section 4A-212 of the UCC (see Cal. U. Com. Code, § 11212) provides that the liability of a "receiving bank" for "acceptance" of "a payment order" "*is limited to that provided in this Article. . . .* [T]he bank owes no duty to any party to the funds transfer except as provided in this Article or by express agreement." (Italics added.)

A wire transfer is a "payment order." (Cal. U. Com. Code, § 11103, subd. (a)(1).) In this instance, the Bank was a "receiving bank." (Cal. U. Com. Code, § 11103, subd. (a)(4); see also Cal. U. Com. Code, §§ 11103, subd. (a)(1), 11104, subd. (d); *Zengen, Inc. v. Comerica Bank, supra*, 41 Cal.4th at pp. 248–249.) The Bank "accept[ed]" the wire transfers by executing them. (Cal. U. Com. Code, § 11209, subd. (a).) Thus, the Bank's liability for that acceptance is limited to its liability, if any, under article 4A.

Article 4A includes specific provisions governing the liability of a receiving bank. For example, it addresses a receiving bank's liability for unauthorized wire transfers (Cal. U. Com. Code, §§ 11201–11204), erroneous wire transfers (Cal. U. Com. Code, §§ 11205, 11207, 11208), amended and canceled wire transfers (Cal. U. Com. Code, § 11211), and erroneously executed wire transfers (Cal. U. Com. Code, §§ 11302–11305). However, nothing in article 4A makes a receiving bank liable for its negligence in accepting a duly authorized and error-free wire transfer.

Article 4A also incorporates a general obligation of good faith. (See Cal. U. Com. Code, § 1304.) Under an earlier version of the UCC, which used a different definition of "good faith," negligence could be considered in determining good faith. (*Hollywood Nat. Bank v. International Business Machines Corp.* (1974) 38 Cal.App.3d 607, 613 [113 Cal.Rptr. 494].) Under

the current version, however, negligence does not defeat good faith. (2 White & Summers, Uniform Commercial Code, *supra*, § 19-3, pp. 285–286.) Thus, it cannot be said that the Bank is liable under article 4A for failing to act in good faith.

■ In sum, Peters is asserting, as a defense, that the Bank is liable for negligently accepting the wire transfers. Under UCC section 4A-212, however, a receiving bank cannot be held liable under common law theories for merely accepting a wire transfer.

For the sake of completeness, we note that *Sheerbonnet, Ltd. v. American Express Bank, Ltd.* (S.D.N.Y. 1995) 951 F.Supp. 403 may appear to be to the contrary, but it is not. There, one bank transferred funds to a second bank, defendant American Express Bank (AEB), with instructions to credit them to the account of a third bank, which was ultimately supposed to transfer them to plaintiff Sheerbonnet. The third bank, however, was insolvent, and its account had been frozen. When AEB received the funds, it credited them to the third bank's frozen account, then promptly offset them against debts that the insolvent third bank owed to AEB. In effect, AEB kept the funds that were supposed to go to Sheerbonnet. (*Id.* at pp. 405–406.)

Sheerbonnet asserted common law causes of action against AEB, including conversion, tortious interference with contract, and unjust enrichment. (*Sheerbonnet, Ltd. v. American Express Bank, Ltd., supra*, 951 F.Supp. at p. 414 (*Sheerbonnet*).) AEB argued that common law causes of action were barred by UCC section 4A-212. However, the only part of UCC section 4A-212 that it cited was the provision that " '[a] receiving bank . . . owes no duty to any party to the funds transfer except as provided in this Article or by express agreement.' " (*Sheerbonnet*, at p. 411.)

The court disagreed, largely because it concluded that common law liability was consistent with article 4A. It noted that article 4A allowed a receiving bank to reject a payment order when " 'proper execution of the order [was] infeasible,' " so the sender could " 'seek alternate means of completing the fund transfer.' " (*Sheerbonnet, supra*, 951 F.Supp. at pp. 411–412, italics omitted, quoting Official Comment 1 to N.Y. U. Com. Code, § 4A-410.) Hence, "receiving banks cannot conduct their business with blinders on to extenuating circumstances." (*Sheerbonnet*, at p. 411.)

■ Significantly, AEB did not cite—and thus the court did not discuss—the specific provision of UCC section 4A-212 that "[l]iability based on acceptance . . . is limited to that provided in this Article." Unlike here, AEB's liability was not based on acceptance alone; it was also based on the fact that AEB exercised an offset and thus failed to pass the funds along. Indeed, even

though the court stated that AEB "accepted" the payment order (*Sheerbonnet, supra,* 951 F.Supp. at p. 411), it is not at all clear that it did. A receiving bank "accepts" a payment order by executing it (Cal. U. Com. Code, § 11209, subd. (a)); it "execute[s]" a payment order by issuing another payment order to another bank (Cal. U. Com. Code, § 11301, subd. (a)). Because AEB kept the funds, it does not appear that it ever issued a payment order to the insolvent third bank. We conclude that *Sheerbonnet* does not stand for the proposition that a receiving bank can be held liable on a common law theory for mere acceptance.

Accordingly, even assuming the Bank was negligent in making the wire transfers, it is entitled to recover the resulting overdraft from Peters.

## IV

## DISPOSITION

The order appealed from is affirmed. The Bank is awarded costs on appeal against Peters.

Hollenhorst, Acting P. J., and McKinster, J., concurred.