Filed 3/18/13  Shamgochian v. Bank of America CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARJORIE H. SHAMGOCHIAN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BANK OF AMERICA, N.A. et al., <br><br> Defendants and Respondents. | F064231/F064480 <br><br> (Super. Ct. No. 662692) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Yonano Law Offices and Nicholas D. Yonano for Plaintiff and Appellant.

Severson & Werson and Jan T. Chilton for Defendant and Respondent Bank of America, N.A.

Law Offices of Kevin MacDougald and Kevin MacDougald for Defendant and Respondent Wells Fargo Bank, N.A.

-ooOoo-

Plaintiff Marjorie Shamgochian fell victim to a lottery scam. She was told that she had won an overseas lottery and all she had to do to receive her winnings was to wire sums of money to certain foreign bank accounts in order to pay taxes and other expenses related to her winnings. Plaintiff, who was elderly and vulnerable, believed what she was told. She wired or transferred $255,366 from her account with defendant Wells Fargo Bank, N.A. (Wells Fargo), and $504,010 from her account with defendant Bank of America, N.A. (B of A), to the foreign bank accounts. These funds were withdrawn by the scam artists and are gone. Plaintiff then sued Wells Fargo and B of A (referred to together as the Banks) for negligence and breach of fiduciary duty on the theory that when plaintiff directed the Banks to wire substantial sums of money to overseas accounts, the Banks suspected that plaintiff was likely being duped by a fraudulent scheme. Plaintiff alleged that the Banks had a duty to investigate the transactions and to protect plaintiff as an elderly customer. The Banks generally demurred to plaintiff's complaint. The trial court sustained the Banks' general demurrers with leave to amend. After an amended complaint was filed, the Banks reasserted their demurrers and the trial court sustained the demurrers without leave to amend. Plaintiff appeals from the resulting judgments of dismissal. We will affirm.

## FACTS AND PROCEDURAL HISTORY

According to plaintiff's complaint, in July 2010, "plaintiff was approached by persons who claimed that she had won a significant lottery contest…. Plaintiff was convinced by these scam artists that if she paid certain sums of money for legal fees and tax purposes, she would receive significantly large winnings. In order to participate, plaintiff was told she would be required to wire or transfer certain sums of money to these persons. Plaintiff, an elderly person, was convinced that this notification of winnings was legitimate, and proceeded to make efforts to forward these sums to the scam artists for the purposes stated by them." She did so by several wire transfers of funds from her B of A and Wells Fargo accounts to the overseas accounts of the scam

2.

artists, and by checks drawn on her B of A account, which transactions are briefly summarized below.

*Plaintiff's B of A Account*

Plaintiff transferred $400,000 into her B of A account. She went to the Turlock, California, B of A branch and requested that the sum of $347,000 be wired from her account to the account of Ubs Pte. Ltd. at Dbs Bank in Singapore. On July 7, 2010, B of A carried out plaintiff's order by wire transferring the sum of $347,000 to the account of Ubs Pte. Ltd. After making an additional deposit to her B of A account, plaintiff directed B of A to wire transfer another $54,644 to Overseas F Pte., Ltd. at OveRsea Chinese Banking. B of A executed that wire transfer on October 5, 2010. Additionally, plaintiff wrote checks of $50,000 and $52,366.

In total, plaintiff sent $504,010 to the scam artists through wire transfers and checks drawn on her B of A account. B of A allegedly did not investigate these transactions or identify the nature of the recipients, even though plaintiff was an elderly person with no history of making such wire transfers.

*Plaintiff's Wells Fargo Account*

On July 9, 2010, plaintiff transferred $25,000 into her Wells Fargo account, and on July 16, 2010, she transferred another $25,000 into that account. Thereafter, plaintiff went to the Turlock branch of Wells Fargo and requested that the sum of $45,000 be wired to an individual named Liam Anderson at United Overseas Bank. Wells Fargo carried out this wire transfer request on July 26, 2010. In August 2010, plaintiff transferred $159,000 into her Wells Fargo account. Plaintiff then went to the Turlock branch of Wells Fargo and requested that the sum of $159,000 be wired to Dbs Bank Ltd., which was carried out by Wells Fargo on August 30, 2010. In October 2010, plaintiff transferred $51,366 into her Wells Fargo account. Thereafter, she visited the Turlock branch of Wells Fargo and requested that the sum of $51,366 be wired to an

individual named Barkey Roland Paul, at Efg Eurobank Ergas. Again, Wells Fargo promptly carried out plaintiff's request.

In total, plaintiff sent $255,366 to the scam artists from her Wells Fargo account. Wells Fargo allegedly did not take any steps to investigate the reasons for the wire transfers or attempt to identify the nature of the recipients thereof, despite the fact that the wire transfers were requested by an elderly person who was "on her own."

According to plaintiff's complaint, the Banks had a duty under the circumstances to investigate the reasons for the wire transfers and to protect plaintiff, an elderly person, from the fraudulent scheme. In essence, plaintiff alleged that the Banks should have monitored the transactions and prevented her from carrying out the wire transfers. Based on these alleged duties of care, plaintiff sought liability under theories of negligence and breach of fiduciary duty.

The Banks each filed general demurrers to the complaint on the ground that they had no duty to monitor or screen the alleged transfers of funds. The trial court sustained the demurrers with leave to amend.

Plaintiff filed her first amended complaint (FAC) on July 20, 2011. The FAC alleged the same causes of action (negligence and breach of fiduciary duty) against the Banks, but added new allegations. According to the FAC, the Banks each maintained their own computer database of suspected fraudulent wire transfers and transactions, including information that identified repeat scam artists. Based on these alleged databases, the FAC claimed that the Banks had "imputed, actual and/or implied knowledge" of the fact that the wire transfers requested by plaintiff were part of a fraudulent scheme targeted at plaintiff. Additionally, because the Banks each carried out said wire transfers while having such "actual, implied and/or imputed knowledge," the Banks allegedly "aided and abetted" the fraudulent actions of third parties.

The Banks generally demurred to the FAC. This time, the trial court sustained the demurrers without leave to amend. The trial court's minute order noted: "Although

4.

technological advances may someday provide financial institutions the ability to prevent the financial travesty which occurred in this case, this court is compelled to follow controlling law and thus also compelled to sustain the demurrer without leave to amend." A judgment of dismissal was entered in favor of B of A on October 24, 2011, and in favor of Wells Fargo on December 13, 2011. Plaintiff appealed from the judgments of dismissal, arguing the trial court erred because the allegations were sufficient to state a cause of action.[1]

## DISCUSSION

### I.    Standard of Review

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

"'It is axiomatic that we review the trial court's rulings and not its reasoning.' [Citation.]" (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.) Thus, "[i]f another proper ground for sustaining the demurrer exists,

---

[1]    Plaintiff filed separate notices of appeal from the judgment of dismissal as to each of the Banks. We ordered the two appeals consolidated.

this court will … affirm the demurrers even if the trial court relied on an improper ground, whether or not the defendants asserted the proper ground in the trial court." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 880, fn. 10.) "[A] demurrer that is sustained on an erroneous ground will nevertheless be upheld on appeal if as a matter of law the complaint fails to state a cause of action. This is a variation of the rule that the appellate court reviews the trial court's *decision,* not its rationale. [Citation.]" (*Fox v. JAMDAT Mobile, Inc.* (2010) 185 Cal.App.4th 1068, 1079.)

## II. Trial Court Correctly Sustained General Demurrers to Complaint

We shall consider the issue of whether the trial court properly sustained the demurrers below by approaching the matter in two parts: (1) Did plaintiff's original complaint state a cause of action against the Banks? and (2) If not, did the additional facts set forth in plaintiff's FAC cure the pleading defects by stating a basis for recovery?

The key allegations in the complaint were that plaintiff was elderly and had no prior history of making such large wire transfers of funds. The Banks simply wire-transferred the funds as plaintiff requested, without inquiring into the reason for the transfers or taking any steps to investigate the transaction or the identities of the recipients. The Banks' actions or inactions allegedly violated a duty of care "to ensure that the wire or other transfer of funds from [plaintiff] to a foreign destination was not a result of a scam or the work of a scam artist against this elderly person." Based on these core facts, plaintiff asserted claims of negligence and breach of fiduciary duty.

As discussed below, we conclude that plaintiff's complaint failed to state a cause of action against the Banks. This conclusion is established under two distinct legal approaches to the issue: The first entails application of the California Uniform Commercial Code (the UCC) to authorized wire transfers as explained in the case of *Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163 (*Chino*); the second involves application of common law principles to the bank-depositor relationship as set forth in the case of *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727

6.

(*Das*).  Both approaches reflect that plaintiff's allegations in this case were insufficient. We now discuss each of these two cases in detail.

### A)  Chino

Before examining the *Chino* case, it is necessary to first provide a brief outline of the extent to which the UCC has displaced the common law in regard to wire transfers of funds.  The 1990 Legislature enacted article 4A (Article 4A) of the UCC as division 11 of the UCC (Cal. U. Com. Code, § 11101 et seq.), entitled "Funds Transfers."  (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 247 (*Zengen*).)[2]  In *Zengen*, where the plaintiff asserted common law claims based on an unauthorized wire transfer, the Supreme Court examined the legislative intent of division 11 of the UCC (as derived from Article 4A) and affirmed that common law causes of action are *displaced* in two areas:  "'(1) where the common law claims would create rights, duties, or liabilities inconsistent with division 11; and (2) where the circumstances giving rise to the common law claims are specifically covered by the provisions of division 11.'"  (*Zengen*, *supra*, at p. 253.)[3]  In the case before it, *Zengen* found that "[b]ecause [division 11 of the UCC] provides detailed rules and procedures concerning funds transfers that squarely cover the

---

[2]      Because California adopted Article 4A of the UCC verbatim (*Zengen*, *supra*, 41 Cal.4th at p. 252), the cases tend to refer to Article 4A and division 11 interchangeably. We do so here as well.

[3]      Under UCC section 1103, subdivision (b), "*Unless displaced by the particular provisions of this code*, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions."  (Italics added.)  Thus, "other principles of law will apply … unless some particular provisions of the [UCC] have displaced them." (*Zengen*, *supra*, 41 Cal.4th at p. 251.)

transactions at issue," the code displaced the plaintiff's common law causes of action. (*Zengen*, *supra*, at pp. 244, 255.)[4]

Zengen proceeded to explain the legislative rationale for enacting a comprehensive statute that would displace many common law claims covering wire transfers:

"'In the drafting of Article 4A [i.e., division 11], a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

"'Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. *The rules* that emerged represent a careful and delicate balancing of those interests and *are intended to be the exclusive means* of determining the rights, duties and liabilities of the affected parties *in any situation covered by particular provisions* of the Article. *Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties*

---

[4] *Zengen* reached this outcome despite the plaintiff's allegations in its negligence cause of action that there were a number of circumstances that should have alerted the bank to the fact that the unauthorized wire transfer was part of a fraudulent scheme. (*Zengen*, *supra*, 41 Cal.4th at p. 254.)

*and liabilities inconsistent with those stated in this Article.*'" (*Zengen*, *supra*, 41 Cal.4th at p. 252, quoting Code Com., reprinted at 23D West's Ann. Cal. U. Com. Code (2002) foll. § 11102, pp. 27-28.)[5]

"This is not to say that the [UCC] necessarily displaces all common law actions based on all activities surrounding funds transfers.… '[T]he exclusivity of Article [4A] is deliberately restricted to "any situation covered by particular provisions of the Article." Conversely, situations not covered are not the exclusive province of the Article.' [Citation.]" (*Zengen*, *supra*, 41 Cal.4th at p. 254.)

Having introduced the potential issue of displacement of common law causes of action by the UCC, we now turn our attention to the particular case of *Chino*, *supra*, 190 Cal.App.4th 1163. In *Chino*, the plaintiff was the victim of a "Nigerian-style e-mail scam." (*Id*. at p. 1166). After depositing the scammer's checks into his bank account, the plaintiff wire-transferred most of the checks' apparent proceeds ($468,000) to the scammer's foreign bank account. Days later, the checks deposited by the plaintiff

---

[5] Similarly, Witkin explains: "The focus of [Article 4A of the UCC] is a type of payment, commonly referred to as a 'wholesale wire transfer,' which is used almost exclusively between business or financial institutions. Payments made by wire transfer, as distinguished from payments made by checks or credit cards, or from electronically based consumer payments, require a separate body of law that addresses the unique operational and policy issues presented by the method. *It was therefore the intent of the drafters of Article 4A to provide a comprehensive body of law to govern the rights and obligations resulting from wire transfers*. [Citations.]

"A typical funds transfer involves a large amount of money, multimillion-dollar transactions being common. Most transactions are completed in a single day; thus, funds transfers are efficient substitutes for payments made by delivery of paper instruments. An additional feature is low cost, in that transfers involving millions of dollars can be made for a few dollars. However, in the event a problem arises, risk of loss to banks may be high. Thus, '*a major policy issue in the drafting of Article 4A is that of determining how risk of loss is to be allocated given the price structure in the industry.*' [Citation.]" (4 Witkin, Summary of Cal. Law (10th ed. 2005) Negotiable Instruments, § 132, p. 505, italics added.)

bounced or were dishonored. This resulted in an enormous overdraft and the bank sought to recover the overdraft against the plaintiff. In response, the plaintiff asserted as a defense that the bank was *negligent* in carrying out the wire transfers that he had requested. (*Ibid.*) The plaintiff claimed the bank should have known of the fraudulent scam because the plaintiff's account activity had historically been between $3,000 and $5,000, yet the wire transfers totaled $468,000 and went to China. (*Id.* at pp. 1172-1173.)

In addressing the plaintiff's negligent wire transfer claim, *Chino* pointed out that "Article 4A of the UCC … governs funds transfers, which include wire transfers. [Citation.] Article 4A has been adopted in California as division 11 of the [UCC]." (*Chino*, *supra*, 190 Cal.App.4th at p. 1173.) *Chino* summarized the principles concerning displacement (*id.* at p. 1174), and then explained at length why the plaintiff's negligent wire transfer claim was displaced by the UCC provisions:

"Section 4A-212 of the UCC (see Cal. U. Com. Code, § 11212)[6] provides that the liability of a 'receiving bank' for 'acceptance' of 'a payment order' '*is limited to that provided in this Article.*… [T]he bank owes no duty to any party to the funds transfer except as provided in this Article or by express agreement.'

"A wire transfer is a 'payment order.' (Cal. U. Com. Code, § 11103, subd. (a)(1).) In this instance, the Bank was a 'receiving bank.' (Cal. U. Com. Code, § 11103, subd. (a)(4); see also Cal. U. Com. Code, §§ 11103, subd. (a)(1), 11104, subd. (d); *Zengen, Inc. v. Comerica Bank*, *supra*, 41 Cal.4th at pp. 248-249.) The Bank 'accept[ed]' the wire transfers by executing them. (Cal. U. Com. Code, § 11209, subd. (a).) Thus, the Bank's liability for that acceptance is limited to its liability, if any, under article 4A.

---

**6** UCC section 11212 states, in part: "Liability based on acceptance [of a payment order such as a wire transfer request] … is limited to that provided in this division. A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer except as provided in this division or by express agreement."

10.

"Article 4A includes specific provisions governing the liability of a receiving bank. For example, it addresses a receiving bank's liability for unauthorized wire transfers (Cal. U. Com. Code, §§ 11201-11204), erroneous wire transfers (Cal. U. Com. Code, § 11205, 11207, 11208), amended and canceled wire transfers (Cal. U. Com. Code, § 11211), and erroneously executed wire transfers (Cal. U. Com. Code, §§ 11302-11305). *However, nothing in article 4A makes a receiving bank liable for its negligence in accepting a duly authorized and error-free wire transfer.*

"Article 4A also incorporates a general obligation of good faith. (See Cal. U. Com. Code, § 1304.) Under an earlier version of the UCC, which used a different definition of 'good faith,' negligence could be considered in determining good faith. [Citation.] Under the current version, however, negligence does not defeat good faith. [Citation.] Thus, it cannot be said that the Bank is liable under article 4A for failing to act in good faith.

"In sum, [the plaintiff] is asserting, as a defense, that the Bank is liable for negligently accepting the wire transfers. Under UCC section 4A-212, however, a receiving bank cannot be held liable under common law theories for merely accepting a wire transfer." (*Chino*, *supra*, 190 Cal.App.4th at pp. 1174-1175, italics added.)

We agree with the analysis in *Chino*. Here, as in *Chino*, plaintiff's complaint alleged that the Banks were liable for accepting or executing plaintiff's duly authorized wire transfers simply because the Banks allegedly should have suspected that plaintiff was being victimized. As in *Chino*, the essence or gravamen of plaintiff's allegations was that of negligence.[7] Following *Chino*, we conclude on these facts that plaintiff's causes of action, whether labeled as negligence or breach of fiduciary duty, cannot be

---

[7]     No basis was alleged for concluding the Banks undertook any special fiduciary duty toward plaintiff in regard to the subject transactions and, as noted hereafter, the bank-depositor relationship is not fiduciary in nature.

11.

maintained because the statutory provisions of division 11 of the UCC regarding authorized wire transfers directly covered this situation and displaced these common law theories. In sum, the Banks cannot be held liable under common law negligence or similar theories for merely executing a duly authorized wire transfer order from its depositor. (*Chino*, *supra*, 190 Cal.App.4th at pp. 1174-1175.)

  *B)*  *Das*

  Even assuming for the sake of argument that plaintiff's negligence and breach of fiduciary duty claims were not displaced by the UCC, plaintiff's complaint failed to state a cause of action under common law principles as applied to the context of a bank-depositor relationship. Here, we examine the approach taken in *Das*, *supra*, 186 Cal.App.4th 727.

  In *Das*, the plaintiff's father was elderly and suffered from dementia. He fell prey to, among other things, a series of fraudulent lottery scams. (*Das*, *supra*, 186 Cal.App.4th at p. 732.) As in our case, the perpetrators of the lottery scams in *Das* "lured their victims with promises of lottery winnings, and instructed the victims to pay taxes by wire in order to claim their prizes." (*Ibid*.) The plaintiff's father liquidated his assets, placed the funds in his accounts held by the defendant, Bank of America, N.A., and repeatedly instructed the bank to transfer sums to overseas bank accounts. The transferred sums exceeded $300,000. Some of the bank's employees wondered about the plaintiff's father's state of mind. Also, despite the alleged suspicious nature of the transfers, the bank never made a report of suspected financial abuse to a local law enforcement or adult protective agency. (*Id*. at pp. 732-733.) After the transfers were made, the plaintiff's father passed away. The plaintiff then brought an action against the bank for multiple causes of action, including (as here) negligence and breach of fiduciary duty. The plaintiff also attempted to predicate some of her claims on purported violations of elder abuse statutes (i.e., Welf. & Inst. Code, § 15600 et seq.), including an allegation

12.

that the bank was liable for assisting in financial abuse of an elder under Welfare and Institutions Code sections 15610.30 and 15657.5. (*Das*, *supra*, at pp. 733, 743-745.)

In discussing the plaintiff's claims for breach of fiduciary duty and negligence, *Das* addressed the issue of whether the bank had a duty of care to "prevent" the plaintiff's father's "participation in lottery scams." (*Das*, *supra*, 186 Cal.App.4th at p. 740.) In that context, *Das* began with the following basic principle of tort law: "'As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' [Citation.]" (*Ibid*.)

*Das* then proceeded to describe the nature of a bank's relationship to a depositor. "[T]he relationship between a bank and its depositor is not fiduciary in character. [Citation.]" (*Das*, *supra*, 186 Cal.App.4th at p. 741.) "'"The relationship of bank and depositor is founded on contract," [citation] which is ordinarily memorialized by a signature card that the depositor signs upon opening the account. [Citation.] This contractual relationship does not involve any implied duty "to supervise account activity" [citation] or "to inquire into the purpose for which the funds are being used" [citation] ....' [Citation.]" (*Ibid*., quoting *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 537.)

However, despite the contractual basis of the bank-depositor relationship, *Das* acknowledged that "a bank can be subject to tort liability to a depositor for misconduct in connection with an account." (*Das*, *supra*, 186 Cal.App.4th at p. 741.) "A bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. [Citation.] In addition, ... a bank may be liable for aiding and abetting a tort when it renders ""substantial assistance"" to a tortfeasor during a business transaction, that is, knowingly aids the commission of a tort. [Citation.]" (*Ibid*.)

Applying these principles to the case before it, *Das* concluded that the plaintiff failed to state a cause of action for breach of fiduciary duty or negligence. The Court of

13.

Appeal noted that no facts were alleged to indicate the bank undertook a special fiduciary duty toward the plaintiff, and it reiterated that "a bank is ordinarily not required to supervise a depositor's use of his own funds." (*Das*, *supra*, 186 Cal.App.4th at p. 742.) Nothing in the complaint indicated that in transferring funds at the plaintiff's father's request, the bank failed to discharge its contractual duties in a reasonable manner. And, as to possible liability for aiding and abetting a tort, there was no allegation that the bank knew that plaintiff's father was the victim of fraudulent or illegal scams. On these facts, *Das* held that no cause of action was stated. (*Id*. at pp. 741-742.)[8]

The complaint in our case is on all fours with *Das*, *supra*, 186 Cal.App.4th 727. Plaintiff essentially alleged that the Banks had a duty to inquire into or monitor plaintiff's wire transfers and prevent her from being defrauded. As explained in *Das*, no such duty existed. Moreover, the bank-depositor relationship is not fiduciary in character and no facts were alleged to indicate that the Banks undertook any special fiduciary obligation toward plaintiff. Nor did plaintiff allege that the Banks failed to reasonably carry out any contractual duties. As in *Das*, plaintiff's complaint failed to allege facts constituting a cause of action for negligence or breach of fiduciary duty.

*(C)    The Two Checks*

Plaintiff's complaint mentioned that in addition to the wire transfers, plaintiff also wrote two checks payable to the scam artists. It is unclear whether plaintiff was claiming the Banks were liable for honoring her checks. If so, that claim is without legal support. Under provisions of division 4 of the UCC, the Banks "may charge against the account of a customer an item that is properly payable from that account …." (Cal. U. Com. Code,

---

[8]    *Das* further held that no claim was stated for allegedly *assisting* in financial abuse by a third party, since the criteria for aiding and abetting must be satisfied. Among other things, that would require that the bank actually knew of the third party's wrongful conduct (i.e., the fraudulent schemes that victimized the plaintiff's father). No such allegation was made in that case. (*Das*, *supra*, 186 Cal.App.4th at pp. 743-745.)

§ 4401, subd. (a).) "An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." (*Ibid*.) Indeed, a bank is liable for failure to honor an item that is properly payable. (*Id*., § 4402, subd. (b).) Here, there was nothing in the allegations to indicate that the two checks were not duly authorized, properly payable checks.

Furthermore, as previously discussed above, a bank-depositor relationship is founded on contract, does not create fiduciary obligations, and a bank has no duty to supervise account activity or to inquire into the purpose for which a depositor's funds are being used. (*Das*, *supra*, 186 Cal.App.4th at p. 741.) As explained in *Chazen v. Centennial Bank*, *supra*, 61 Cal.App.4th at page 539: "The provisions of the California Uniform Commercial Code and federal regulations governing bank deposits and collections require banking transactions to be processed quickly and automatically and impose strict deadlines for the payment or timely dishonor of checks. [Citations.] Banks are strictly liable for the wrongful dishonor of checks. [Citations.] Under this system favoring expedited handling of funds transfers, a bank cannot be expected to track transactions in fiduciary accounts or to intervene in suspicious activities." In conclusion, plaintiff failed to state a cause of action regarding the two checks.

### (D)  *No Duty Based on Elder Abuse Reporting Statutes*

Finally, in arguing that the Banks had a duty of care to protect plaintiff from being victimized by fraudulent scams, plaintiff's opening brief on appeal referenced the fact that banks are included in the list of "'mandated reporters of suspected financial abuse of an elder'" in Welfare and Institutions Code section 15630.1.[9] However, *Das* considered and rejected a similar argument in that case. (*Das*, *supra*, 186 Cal.App.4th at

---

[9]    This reporting statute is part of the Elder Abuse and Dependent Adult Civil Protection Act, codified at Welfare and Institutions Code section 15600 et seq., also referred to herein as the elder abuse statutes.

pp. 737-740.)  As explained in *Das*, subdivision (g) of Welfare and Institutions Code section 15630.1 precludes use of the reporting duty in that section as a predicate for a duty of care to support a negligence action.  (*Das*, *supra*, at pp. 737-739.)  We agree with that analysis.  Accordingly, the statutory reporting obligation does not assist plaintiff in this case.

## III.    The Amended Allegations Were Insufficient

Thus far, we have examined the allegations of plaintiff's original complaint and determined that plaintiff failed to state a cause of action.  We now consider the new or additional allegations set forth in the FAC.

According to the FAC, the Banks maintained their own computer databases of suspected fraudulent wire transfers and transactions, including information that identified repeat scam artists.  Based on these computer databases, the Banks allegedly had "imputed, actual and/or implied knowledge" of the fact that the wire transfers requested by plaintiff were part of a fraudulent scheme targeted at plaintiff.  The Banks allegedly "aided and abetted" the fraudulent actions of the third party scam artists by carrying out plaintiff's requested wire transfers.

To the extent plaintiff alleged this database theory to suggest that the Banks' employees should have checked the database but did not do so, it was simply a repackaged version of the negligence cause of action.  In accordance with our discussion of the authorities bearing on this case, the Banks had no duty of inquiry regarding plaintiff's account activities and plaintiff cannot state a negligence claim premised on the Banks' execution of plaintiff's duly authorized wire transfers.  (*Chino*, *supra*, 190 Cal.App.4th at p. 1175; *Das*, *supra*, 186 Cal.App.4th at p. 741.)

Plaintiff's FAC also claimed the Banks were liable on a theory of aiding or abetting the commission of a tort.  Under California law, "'"[l]iability may … be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or

16.

encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." [Citations.]' [Citation.]" (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144 (*Casey*).) "[A] bank may be liable for aiding and abetting a tort when it renders ""substantial assistance"" to a tortfeasor during a business transaction, that is, knowingly aids the commission of the tort. [Citation.]" (*Das*, *supra*, 186 Cal.App.4th at p. 741.) For example, a bank may be liable as an aider and abettor when it knowingly ""[a]ssists" third parties in committing financial abuse of an elder. (*Id*. at p. 744; see also Welf. & Inst. Code, § 15610.30, subd. (a)(2) [defining "'[f]inancial abuse'" of elder to include one who "[a]ssists in taking, secreting, appropriating, obtaining, or retaining … property of an elder … for a wrongful use or with intent to defraud, or both"].) The assistance by which a bank aids or abets the commission of a tort may come in the form of ordinary banking transactions that banks routinely perform for their customers. (*Casey*, *supra*, 127 Cal.App.4th at p. 1145.) "[A] bank may be liable as an aider and abettor of a tort if the bank, in providing ordinary services, 'actually knew those transactions were assisting the [defendant] in committing a specific tort.'" (*Das*, *supra*, at p. 745, citing *Casey*, *supra*, at p. 1145.) "[W]hen … a bank provides ordinary services that effectuate financial abuse by a third party, the bank may be found to have 'assisted' the financial abuse only if it knew of the third party's wrongful conduct." (*Das*, *supra*, at p. 745, fn. omitted.)

Thus, the key to plaintiff's new theories set forth in the FAC was whether plaintiff had adequately alleged that the Banks had *actual knowledge* of the fraudulent scam being perpetrated against plaintiff and proceeded to aid the perpetrators' commission of that tort. "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant

17.

substantially assisted." (*Casey*, *supra*, 127 Cal.App.4th at p. 1145.)[10] "[O]n demurrer, a court must carefully scrutinize whether the plaintiff has alleged the bank had actual knowledge of the underlying wrong it purportedly aided and abetted." (*Casey*, *supra*, p. 1152; accord, *Das*, *supra*, 186 Cal.App.4th at p. 745.) Conclusory allegations are wholly insufficient to satisfy this pleading requirement. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318 [a demurrer does not admit conclusions of fact or law]; *Casey*, *supra*, at p. 1153.)[11]

In particular, the pleader must allege that the bank actually knew of the *specific primary wrong*—the underlying tort—that the bank intentionally aided. (*Casey*, *supra*, 127 Cal.App.4th at p. 1145; see also *Lomita Land & Water Co. v. Robinson*, *supra*, 154 Cal. at p. 47 [aiding and abetting means participation in a specific primary wrong "with knowledge of the object to be attained"].) In *Casey*, the plaintiff alleged the banks knew that certain bank customers (officers and fiduciaries of a corporate entity) were involved in "'wrongful or illegal conduct,'" including dishonest activities such as laundering money and making excessive withdrawals in violation of fiduciary duties they owed to said corporate entity. (*Casey*, *supra*, at p. 1152.) *Casey* held these allegations were insufficient to satisfy the actual knowledge requirement because they did not establish the bank's actual knowledge of the specific primary wrong that it allegedly participated in— namely, a misappropriation or theft of $36 million from the corporation. (*Id*. at pp. 1149,

---

**10** In the words of an earlier case, the term "'aid and abet'" implies "an intentional participation *with knowledge of the object to be attained*." (*Lomita Land & Water Co. v. Robinson* (1908) 154 Cal. 36, 47, italics added.)

**11** *Casey* indicates that careful scrutiny of a plaintiff's allegation of actual knowledge is particularly appropriate in the context of claims that a bank's performance of ordinary banking services for a bank customer aided and abetted the commission of a tort. (*Casey*, *supra*, 127 Cal.App.4th at pp. 1149-1153 [competing policies at stake in banking system require judicial scrutiny on demurrer of alleged actual knowledge for purposes of claim against bank for aiding and abetting].)

18.

1152-1153.) It was further alleged in that case that "'each [bank] acted with knowledge of the primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.'" (*Id*. at p. 1153.) *Casey* held that such allegation did not satisfy the actual knowledge pleading requirement: "This conclusory allegation fails to identify the primary wrong and is not otherwise supported by the rest of the complaint, which fails to allege the banks knew the DFJ Fiduciaries were misappropriating funds from DFJ." (*Ibid*.)

Here, the FAC alleged that the Banks had "imputed, actual and/or implied knowledge" that the wire transfers were "part of a fraudulent scheme" that targeted plaintiff. This language was at best equivocal since it mentioned actual knowledge as only one possibility among several. A subsequent allegation in the FAC similarly stated: "In permitting the wire transfers described herein, defendant[s] …, having actual, implied and/or imputed knowledge or access to knowledge that a wire transfer to this recipient bank or individual was likely fraudulent in nature, defendant[s] … aided and abetted the fraudulent actions of third parties .…" This latter allegation indicated the Banks' level of knowledge could have merely consisted of "access to knowledge" that plaintiff was "likely" to be part of a fraudulent scheme, which is a far cry from actual knowledge and instead returns to plaintiff's claim of negligence. Although actual knowledge was mentioned as a bare possibility, it cannot be ascertained from these allegations that the Banks, in fact, *had* actual knowledge.

In any event, the assertion of actual knowledge in the FAC was *conclusory* in the sense that no supporting facts were set forth in the pleading. The alleged existence of computer databases did not fill this void. There was nothing to suggest that any employees or agents of the Banks actually learned from said databases (or from any other source), prior to plaintiff's wire transfers, that said wire transfers to overseas accounts were part of a fraudulent scheme being perpetrated against plaintiff by third parties in which plaintiff's funds, once wired, would be lost to the perpetrators. (See *Lomita Land*

19.

*& Water Co. v. Robinson*, *supra*, 154 Cal. at p. 47 [aiding and abetting means participation in a specific primary wrong "with knowledge of the object to be attained"].) This was the thrust of the underlying tort (or the specific primary wrong) of which the Banks had to have *actual knowledge* in order to be found liable for aiding and abetting in that particular wrong. (*Casey*, *supra*, 127 Cal.App.4th at pp. 1145, 1153.) Yet, there was no adequate statement of facts in the FAC to show that the Banks actually knew of such material facts when the wire transfers were processed. Plaintiff failed to meet the actual knowledge pleading requirement since the FAC never got beyond mere conclusory and equivocal allegations. Consequently, the general demurrers to the FAC were properly sustained.

## IV.    No Basis For Leave to Amend Was Presented

The remaining question is whether the demurrers to the FAC were properly sustained without leave to amend. As aptly summarized in *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 44, "[t]he burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. [Citation.] Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend. [Citations.]" Here, plaintiff offered no new facts or allegations that would potentially cure any of the defects noted above. Plaintiff did propose to add new allegations that one of the scam artists who spoke to plaintiff represented that he was an attorney who would assist her in acquiring her lottery winnings. As the Banks correctly point out, whether or not a third party made such representations to plaintiff makes no difference to her case against the Banks and, furthermore, plaintiff failed to substantiate this new theory with legal authority. We conclude that plaintiff failed to offer any basis for leave to amend

20.

and, therefore, the trial court did not abuse its discretion in sustaining the demurrers without leave to amend.

## **DISPOSITION**

The judgment of the trial court is affirmed.  Costs on appeal are awarded to the Banks.

_____
Kane, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Detjen, J.